**HERRICK & SMITH, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 85–1594.

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1986.

Decided Sept. 29, 1986.

Harold N. Mack, with whom Nathan L. Kaitz and Morgan, Brown & Joy, Boston, Mass., were on brief, for petitioner.

David A. Fleischer, with whom Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, and Elliott Moore, Deputy Associate General Counsel, Washington, D.C., were on brief, for respondent.

Before CAMPBELL, Chief Judge, ALDRICH and ROSENN,[*] Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

On May 11, 1983, charging party Mary Moran, a legal secretary employed by the now dissolved Boston law firm of Herrick & Smith, accompanied by a small number of other secretaries, met, at the suggestion of one of the partners, with the firm's managing partner, Remis. The purpose of the meeting, for which Moran had prepared an agenda, was to voice dissatisfaction with employee relationships, and to air specific complaints. The National Labor Relations Board warrantably found that this was activity protected by Section 7 of the Act. 29 U.S.C. § 157. The meeting was pleasantly conducted on both sides, and, even on the firm's evidence, there were airable grievances.[1] On June 17, 1983, Moran was discharged. The ALJ, although, at one point, finding that petitioner did have a valid complaint, found that the real reason for the discharge was her having "engaged in concerted activities." Stating that it had carefully examined the record, the Board affirmed the findings and

---

[*] Of the Third Circuit, sitting by designation.

1. Summarizing the agenda, after a very courteous introduction thanking the managing partner for receiving them, the general matters presented were the secretaries' alleged low morale (noting the number who had recently left); the feeling that the lawyers did not treat them with courtesy and respect (to which partner Anninger contributed, post); that Cashman, post, did not give them sufficient response and that her assistant was highly disliked, and that they were asked for uncompensated overtime on account of pro bono work.

proposed order without opinion. Petitioner seeks review.

Whether the ALJ was correct or not, on this single question of fact this is the most inflated case about a minimum matter—one secretary, no general course of improper conduct, no union, and no novel principle—that it has ever been our misfortune to encounter. The ALJ, who never once suggested curtailment, permitted the trial to extend over 14 days between October 31, 1983 and March 13, 1984. The resulting transcript ran to 2400 pages,[2] "abbreviated" for us to 1072 pages. Even thus abbreviated, we are treated, not only to endless repetition, but to pages of whether a partner signed two overtime slips, or three, or whether an absence was on a Wednesday or a Thursday, all of no conceivable significance except to demonstrate that memories were not perfect, and that no detail of office life was too unimportant to escape minute and unrestricted exploration.[3] This was not foot dragging by petitioner. General Counsel introduced 52 exhibits, of which those reproduced fill 156 pages of appendix, giving us a total of 1344 pages to review in addition to the ALJ's decision.[4]

Having embarked on such a scrutiny, the ALJ followed it up, on November 20, 1984, with a Decision of 52 tightly written pages, each with over 50 lines of text, if no footnotes. By sampling segments, we compute the Decision to run over 30,000 words. The expense of all this, in time and money, is not our concern, but the burden on our time for obligatory review most certainly is. The Board may choose to express its approval in a single sentence, but even a superficial reading of the Decision convinced us that there could well be weaknesses that its extraordinary length served to conceal. Study reveals this to be so.

Preliminarily, we comment upon the ALJ's methodology. It is, of course, proper, indeed usual, to form an opinion that a particular witness is credible, or not credible. And it is also true that a generally credible witness may sometimes not speak the truth. But the degree that the ALJ switched back and forth between individual witnesses is almost startling. Again, a witness will be rejected on one occasion because self-serving, but accepted the next without apparent hesitation. In one conference each participant was the credible one sometimes, and not credible others. All these things are possible, but in a lifetime on both sides of the bench the present writer has never possessed such total confidence in his discernment. Unfortunately, as will appear, it here led to trouble.

Coming to the merits, to start with the high points, as already mentioned the May 11 meeting, on which the ALJ relied, was not hostilely formed, but was suggested by a member of the firm, was agreeably presented, and was admittedly justifiable. In fact, the basis for the ALJ's decision was the self-drawn inference—the Board has not answered petitioner's pointing out that there were no expressions, or indications of any kind, unless the discharge itself be such—that annoyance at the airing of justifiable complaints caused the discharge. This is a damned-if-you-do, damned-if-you-don't, approach. Annoyance would seem equally inferable, and perhaps more so, if the complaints had been wholly unjustified. Under the circumstances, we think there should be something more tangible than the mere fact there was a meeting. It would seem an extraordinary policy if simply because there was a meeting, even one suggested by the employer, and later someone was discharged, an ALJ

---

**2.** As a matter of interest, this is 38% of what we hear was the total transcript in the recent half-billion dollar, anti-trust action between the two national football leagues.

**3.** We note, in passing, that several times the ALJ mentioned other witnesses not having been called, omissions we cannot regret.

**4.** The briefs of the parties required us to read much of this record; petitioner's because of frequent recital, as facts, of testimony that need not be accepted, and the Board's because of omission of parts of the evidence that were not, and, in some cases could not be, rejected; in both instances putting the case in a much too favorable light.

could, without more, infer impropriety. Particularly this should be so when the ALJ found, post, that Moran did thereafter furnish cause for legitimate employer dissatisfaction.

To continue, Moran was what was known as a "floater," a secretary who would be assigned for extra work, or to fill in for secretaries who were absent, for one reason or another. Sometimes one assignment would be for a considerably long period, as occurred from late 1981 to the spring of 1983. The ALJ found that over the long run, her performance reports ranged from the excellent to the critical, and in between.

In May, 1983, Moran was assigned to a partner, Thomas Anninger, who had lost his regular secretary and was looking for a new one. He appears to have been difficult to please, and erratic in his views, but, at least to some extent, he and Moran hit it off. In fact, they did so sufficiently well that when Anninger testified that, two or three weeks before the final episode, he told Mrs. Cashman, the personnel director, that when he returned from his vacation week of June 13th, he did not wish Moran back, the ALJ refused to believe him. In relying simply on the fact that things were going well, the ALJ failed to look back to a finding, eight Decision pages earlier, that, though no date was set, it was clearly understood from the beginning that this was a temporary assignment.

Prior to the week of June 6 Anninger had told Moran that he was going on vacation the 13th, and that the week of the 6th was to be very busy. Monday morning, the 6th, Moran had to be in court on a personal matter, but, without his knowledge or assent, she took the rest of the day off. Thereafter, on either Wednesday or Thursday, she was out sick. The ALJ found that Anninger complained to Cashman on Thursday that, to quote the ALJ, "he 'had it up to here with Moran' and

could not count on her; that the week had been 'horrible,' and that he wanted a different secretary when he returned." Cashman asked him for a written appraisal. He came in on Saturday the 11th to clean up, and wrote an unfavorable appraisal, concluding that he felt Moran should be discharged. The ALJ refused to believe Cashman's testimony that he had recommended this last on Thursday because, in his own testimony, he had failed to recall it. There is no reason why Anninger would make this recommendation Saturday and not Thursday, and nothing of substance turned on it, but Cashman, who was credited in many matters, was disbelieved here because she was not corroborated.

Continuing with Anninger, we would have thought that his upset about his pre-vacation week, which we consider many lawyers less high strung would sympathize with, would figure in the ALJ's thinking in weighing the causes for his recommending Moran's discharge. Instead, it is entirely discounted in favor of the May meeting. "Anninger impressed me as a man who does not take criticism lightly," and that was that.

While it is not a determinative matter, it might not be amiss to note the revelation that Moran made on May 11 as to Anninger's conduct that is found to have annoyed him so much that on June 11, if not on June 9, he recommended her discharge. On an occasion in early May, having been told by Moran that she could not stay after 5:00, Anninger had expressed his irritation by saying, "Shit, shit, shit." Moran said nothing at the time, but the next day she reported it, with a written memo, to the personnel director. "This is how we are treated, Mrs. Cashman." Cashman told her that, in the future, she should speak up and complain directly to Anninger.[5] Our problem is not so much that we have difficulty in regarding Moran's raising this at the

---

5. We note that the ALJ believed Cashman's version of this incident and disbelieved Moran's testimony that Cashman threw the memo on the desk, said she wanted no more such, and criticized Moran for being inflexible. It seems that Moran was given to the dramatic. When a partner to whom she had earlier been assigned had complained of her being ten minutes late, he "screamed" at her, and when administrative manager Clark discharged her he "screamed" and "yelled." The ALJ disbelieved this last, too. *See* post.

May meeting as so serious in Anninger's mind that he wanted her discharged,[6] as it is in following the ALJ's thinking. How could the criticism have affected him so little that, following the meeting, their relations were so fundamentally good that the ALJ was unable to credit his testimony that he told Cashman he did not want her back after his vacation, but affected him so much that his reaction to the week of June 6 was just make-believe, a cover-up excuse for seeking her discharge? The logic of this entirely escapes us. The ALJ does, it is true, point to some favorable appraisals that Anninger gave Moran after May 11, but here, why would he have done this quite unnecessary act if criticism of him at the meeting was rankling? The ALJ travels both sides of the street, seemingly without recognizing it, and, at any rate, without explaining it.

Turning to Cashman, the ALJ found that she "was not as unconcerned about the complaints made about her to Remis as she testified to being." Again, as with Anninger, there was no affirmative evidence of this concern, unless shown by the June events themselves. The ALJ even disbelieved Moran's account that Cashman avoided her. Concern was found by the process of disbelieving Cashman's testimony that she was *not* concerned. Though tempting, it is fallacious to think that disbelief of testimony warrants an affirmative finding to the contrary. If a plaintiff must show that it rained on Saturday and calls the defendant, who testifies that it did not rain, no amount of confidence of the trier in his ability to conclude that defendant was lying can serve to constitute proof of a rainfall. *Cf. NLRB v. Joseph Antell, Inc.,* 358 F.2d 880 (1st Cir.1966). Were the rule otherwise, any plaintiff could prove any case in the world simply by calling his opponent and getting him to deny it, and then arguing he was a liar. The Board does not like this principle, but it faces more than our own decision. *Cf. Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (disbelief of libel defendant's testimony of his good faith cannot warrant a finding of lack of good faith, viz., of malice).

On June 16, Cashman met with Moran to discuss Anninger's unfavorable appraisal, together with other matters, including reports that she had been "bad-mouthing" the firm. Moran reacted very hostilely, saying it was all "ludicrous," and wanting, instead, to discuss her own complaints. With respect to this conference, and the one the next day, the ALJ credited Cashman over Moran in all respects but one. A memo was prepared of what had been said, and, admittedly, Moran refused to sign it. The ALJ found, "Moran credibly testified that she did not recall Cashman telling her that she only wanted Moran to sign a memo to acknowledge that the conversation took place, and not as an indication that she agreed with the substance of what she had been told." Four pages later this became, "Moran denied in her testimony ... that she was told that she was not being asked to acknowledge that the contents of the memo were substantially accurate, but only that it correctly reflected what was said the day before. At that point Moran appeared more forthright and candid than did Cashman, and I therefore credit Moran." In point of fact, Moran testified three times that she did not recall, but when asked whether she would deny, refused to do so. Ergo, Moran appears "candid" in saying something she did not even say at all.

Finally, the memorandum itself, which Moran testified was given her to read, concluded with the following:

> I have read and understand the contents of this memorandum.
>
> _____
> Mary M. Moran

In point of fact, at no time did Moran, or anyone else, testify that she was asked to

---

6. While we do not approve it, at the same time we do wonder at the seriousness. This was a, so-to-speak, intransitive expletive, as distinguished from another not uncommon, four-letter-word expression, listener-directed.

acknowledge that the complaints against her were factually correct.

On June 17 there was a further meeting, this time including Michael Clark, an administrative manager of the firm. We again quote from the ALJ's Decision.

> According to Moran, Clark then told her that he wanted her to sign the memo and she either did not respond or refused to sign.[30] Moran testified that Clark then told her again to sign the memo and when she refused he became 'very red' and, leaning over his desk, pointed his finger at her and 'screamed' that she was fired. However, both Cashman and Clark credibly denied that Clark had acted in this way.

---

30. On direct examination Clark testified that the first time Clark told her to sign the memo she refused, whole on cross-examination she testified that when Clark first gave her that instruction she did not say anything.

The ALJ's account of the June 16 and 17 meetings is highly elaborate and has internal inconsistencies. In addition to the alleged denial, at one point the ALJ said that Moran's "statement that Cashman told her that her continued employment would depend on whether she signed the memo, seemed to me to be more of an attempt to bolster her theory of why she was ultimately discharged than to accurately recount the events at issue." Yet, elsewhere, the ALJ found that, on June 17, "Cashman sent a memo to Remis" stating, in part, " 'She refused to sign. Mike told her we had no alternative but to terminate her employment.' " Still elsewhere, the ALJ affirmatively found that Clark did say this to Moran. Thus Moran is not only found candid when she said something she did not say; she is charged with a self-serving departure when her testimony agrees with the record. (The Clark memo was very abbreviated. Even on her own testimony Moran was uncooperative in the total discussion.)

To continue with the admitted refusal to sign, although the ALJ went into extensive detail in an attempt to find that Moran was unusually treated, the evidence showed, backed by a number of exhibits, that all employees who were called in for review signed the memorandum thereof with the same acknowledgement presented to Moran. Moran's only given reason for not signing was that the "warning notice not only is an insult, but also a clear blatant act on your part to set me up to be fired." In this circumstance the ALJ found that the "refusal to sign was also a factor in her discharge."

This finding would seem inescapably correct. An employer with 70 secretaries cannot permit one, already under criticism, whether claimed "ludicrous" or not, to reject its practices and, in effect, tell it to go jump. This finding, however, was never mentioned again, nor was it placed in juxtaposition with, or weighed against, in any articulate fashion, the annoyances inferred as flowing from the May meeting.

On pages 50 and 51 the ALJ finally disposed of petitioner's reasons for discharging Moran, doing so on the basis of the individuals involved. For Anninger, whose unfavorable report prior to leaving on vacation sparked the discharge, the ALJ, having disbelieved the testimony that he requested a reassignment two or three weeks before because inconsistent with the good post-May 11 relations, was able to say that the fact that his recommendation was "based on the events of only one week strongly supports the inference, which I draw, that Anninger was trying to build a case for Moran's discharge and that he was motivated by concerns other than her performance as a secretary." This, we might again call flexible logic, was followed by, "Moreover there is no contention that Moran was not entitled to the time she took off the week of June 6." Of course there was. Even assuming she was in fact sick on Wednesday or Thursday, she took Monday afternoon off on her own, just when she knew Anninger particularly needed her. However, it seems that Anninger, in describing the week as "horrible," was making it up to conceal his real feeling about the May 11 meeting.

The ALJ's ease in ascribing improper motives is even carried to the extent of finding such in Anninger's having wanted

**570**

Cashman to be present at the May meeting. For a substantive meeting involving personnel policies, who might be thought a more important attender than the personnel director?[7] To use a mild term, we cannot follow the ALJ's thinking process with respect to Anninger.

For Cashman, the ALJ starts out by referring to the previous affirmative finding of her "concern" over the May meeting, a finding we have pointed out was erroneously reached. With that gone, there was neither act nor word on which to predicate a finding of concern. The ALJ's next step was to say that Cashman stimulated Anninger to write an unfavorable report so that she could use it to obtain her ends. Yet Anninger quite obviously needed no encouragement. He was the one who initially voiced the complaint; Cashman, in her capacity as personnel director, merely asked him to submit the complaint in writing. As a finale, the ALJ concludes that Moran "was under no obligation to acknowledge the validity of Anninger's criticisms." As we have laboriously stated, she was not asked to.

Finally, Clark, the active discharger, is under the same cloud, although here the ALJ does not even point to any basis for his resentment, unless mere disbelief of some of his testimony on collateral matters could be thought such. (It could not be, of course, ante.) He was not at the May meeting; he was not involved, nor criticized. While the ALJ found that Clark "was looking for a basis for either causing Moran to resign or discharging her," no support for this finding exists.

The ALJ concludes, "Clark's assigning Moran's refusal to sign as grounds for discharging her is the final indication that the Respondent's agents were motivated [by her] concerted activity." Forgotten is the finding, 15 pages earlier, "I find Moran's refusal to sign was also a factor in her discharge." If, conceivably, this had not been forgotten, the ALJ is saying that if an employer advances a bona fide reason, this in itself is indicative of impropriety.

■ It is black letter law that the Board's initial burden is to make a prima facie showing that the employee's protected conduct was a substantial or motivating factor for the discharge, after which the burden of going forward shifts to the employer. E.g., *NLRB v. Horizon Air Services, Inc.,* 761 F.2d 22, 27 (1st Cir.1985). The Board's showing must, of course, stand, if supported by substantial evidence on the record, viewed as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Yet here the mildest form of employee-employer meeting, employer suggested, agreeably conducted, and followed by no unpleasant acts or words, became the sound basis of an unfair labor act,[8] because an ALJ, as to one person involved, was "impressed that he did not take criticism lightly," and that another "was not … unconcerned." In the course of this gossamer case the ALJ misstated evidence, reasoned illogically, and reached an unsupported and unsupportable result. On the record as a whole, confirmed by an analysis of the Decision itself, we find the Board did not adequately meet its initial burden. It is not a heavy burden, but to find otherwise here would make it meaningless.

In view of the exhausting work we have been put to we feel justified in saying that General Counsel may present any case he wants to, but, with all due respect, even had it been errorless, this had become a gross imposition that the Board, with its supervisory authority over trial counsel and ALJs, should never have inflicted on us. If its staff has nothing better to do, we have. We call its attention to a recent remark by the incoming Chief Judge of the D.C. Circuit. "A particular need in this circuit is for a special calendar for the

---

7. We will not take space to describe the misunderstanding that had led to her absence.

8. We will not take space to review the ALJ's separate finding that respondent's warning Moran against "bad-mouthing" the firm was an unfair labor practice. It could not rise above the discharge.

complex administrative law cases, which take so much of our time." *New D.C. Circuit Chief Judge Wald Interviewed,* Third Branch, July 1986, at 1, 6. Complex cases have to be complex. If we had not seen it, we would have found it difficult to think the present case was for real.

The petition for review is granted; the order will not be enforced. Costs are charged against the Board.