256 N.J. Super. 309 (1992)
606 A.2d 1140
NANCY STRUMPH, PLAINTIFF-APPELLANT,
v.
SCHERING CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
May 21, 1992.
*310 Before Judges PRESSLER, SKILLMAN and D'ANNUNZIO.
Jack E. Milkis attorney for appellant (Earl G. Kauffman, admitted pro hac vice; Jack E. Milkis, on the brief).
Dughi and Hewit, attorneys for respondent (Russell L. Hewit and Mary Elizabeth Gazi, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
This is a product liability action against Schering Corporation, the manufacturer of a drug marketed under the name Trilafon. Plaintiff, Nancy Strumph, alleges that she developed neuroleptic malignant syndrome (NMS) as a result of her ingestion of Trilafon, a neuroleptic drug, which had been prescribed by her treating physician. Schering's liability is posited on the contention that it did not adequately warn of the risk of NMS. Plaintiff now appeals from a summary judgment entered on the ground that plaintiff could not establish that defendant's allegedly inadequate warning was a proximate cause of her injury.
Plaintiff, diagnosed as a paranoid schizophrenic and depressive, has a long history of psychiatric illnesses that required medical treatment. The drug Stelazine, also a neuroleptic medication, had been effective in treating plaintiff's condition, and she was maintained on a regimen of Stelazine and Thorazine from September 1982 through June 1986. However, in June 1986, plaintiff attempted suicide by overdosing on Stelazine and slashing her wrists.
She was admitted to the Atlantic City Medical Center, through the emergency room, where she came under the care of Dr. Norman Chazin, a board certified psychiatrist. Dr. Chazin selected Trilafon to treat appellant's paranoid schizophrenia. *311 Dr. Chazin explained during his deposition that he selected Trilafon because:
In reviewing the patient's history of medications and the difficulty that she had with several of the ones that I had mentioned previously, Trilafon had not been tried.
Trilafon is an effective neuroleptic medication that I have had ample experience with, and this appeared to be a reasonable treatment choice for the patient.
Chazin also prescribed Cogentin and Lithium to assist in treating appellant's conditions. Plaintiff tolerated the prescribed medications well and her condition improved. She was discharged from the Atlantic City Medical Center on June 10, 1986 on a regimen of Trilafon, Cogentin and Lithium, with instructions to see her private treating psychiatrist. In July 1986, plaintiff was hospitalized with NMS symptoms. The record suggests that she suffered from substantial disabilities allegedly caused by ingestion of Trilafon. Whether Trilafon was a cause in fact of plaintiff's injury is a disputed fact not material to the issue on appeal.
In 1986, defendant, Schering Corporation, warned of the risk of NMS. The Physician's Desk Reference (PDR) entry for Trilafon stated in an unhighlighted block of text under the heading "CNS Effects":
Neuroleptic malignant syndrome has been reported in patients treated with neuroleptic drugs. It is a relatively uncommon, potentially lethal syndrome, characterized by severe extrapyramidal dysfunction, with rigidity and eventual stupor or coma; hyperthermia and autonomic disturbances, including cardiovascular effects. There is no specific treatment, the neuroleptic drug should be stopped immediately.
Plaintiff bases her liability case on the contention that defendant provided an inadequate warning of NMS as a risk of Trilafon therapy. Specifically, plaintiff contends that defendant failed to give proper prominence to the risk and consequences of NMS until the late 1980s at the earliest and that its 1986 warnings failed to communicate that risk with sufficient urgency. Plaintiff refers to the 1990 PDR reference for Trilafon as an example of a more adequate warning. In 1990, NMS is mentioned earlier in the text under the heading WARNINGS rather than later in the text under ADVERSE REACTIONS. *312 Moreover, in 1990 the subject is introduced with its own heading, NEUROLEPTIC MALIGNANT SYNDROME (NMS), rather than being "buried"[1] as a sub-topic under "Other CNS effects" under the general heading "Adverse Reactions."[2]
Dr. John R. Rushton, who had been treating plaintiff for many years prior to her June 3, 1986 hospital admission, testified on deposition that in 1986 he would have "veered away from" Trilafon because of its risk of causing NMS. In a letter to plaintiff's counsel dated December 7, 1989, Rushton stated, "I avoid the use of Trilafon, turning to medicine less predisposed to bring on a neuroleptic malignant syndrome." Rushton also stated that the warning given by Schering Corporation in 1986 was inadequate. Plaintiff's other expert, Dr. Frederick J. Goldstein, concurred in this assessment.
Dr. Chazin was deposed on October 30, 1990. He testified that he was aware of the risk of NMS associated with Trilafon when he prescribed the medication to appellant and that if a different warning of the risk of NMS had been placed in the drug's package insert or PDR reference, he still would have prescribed Trilafon to the appellant:
Q. When you prescribed the Trilafon for her, were you aware of the fact that there were potential risks and side effects to the use of that medication?
A. I was aware of that, yes.
....
Q. Knowing all of those potential risks and side effects, you still decided to prescribe the drug Trilafon for Nancy Strumph?
A. That's correct.
Q. Why?
A. The neuroleptic benefit far outweighed the possibility of the development of the side effects that you have mentioned.
Q. Doctor, I assume  but please correct me if I'm wrong  that you probably know a little bit more  maybe its a lot more, but that you know more today, *313 1990, than you did in 1986, about Trilafon and some of its potential risks and side effects.
A. Yes, I think that that's true.
Q. Doctor, knowing everything that you know today about Trilafon and its potential side effects, and with particular reference to NMS, had you known that same knowledge, same information, in June, 1986, when you prescribed Trilafon for Nancy Strumph, would you still have prescribed the medication for her?
A. Yes.
....
Q. Doctor, before prescribing the Trilafon to Nancy Strumph, did you read the package insert or PDR insert on the medication?
A. No, I did not.
Q. What were the sources of your knowledge concerning the potential risks and side effects of Trilafon?
A. The source is both from my formal education in psychiatry, as well as my daily clinical experience.
....
Q. Doctor, had you read a package insert or a PDR insert on Trilafon back in 1986 that had the risk of NMS highlighted in large block print as it is in the [1990] PDR insert, would you still have prescribed the medication for Nancy Strumph?
A. Yes, I would.
Q. Doctor, if it had been highlighted like that but in bold red print to stick out even more, would you have prescribed the medication?
A. Yes, I would.
Q. If you saw Nancy Strumph today, October 30, 1990, under the same or similar circumstances that you saw her in June, 1986 and in the same or similar condition that she was in in June, 1986, if you saw her today, would you have  would you prescribe Trilafon today to treat her condition?
A. Yes, I would.
Q. And that's knowing everything that you know today, in 1990, about Trilafon, its side effects and its risks, including, but not limited to, NMS?
A. That's right.
Following her discharge from the hospital by Dr. Chazin, the plaintiff saw Dr. Leo Brown, a private practicing psychiatrist at the Atlantic City Mental Health Center on June 13, 1986. Dr. Brown obtained a medical history, performed a psychiatric examination and diagnosed the plaintiff as suffering from paranoid schizophrenia and depression. He continued the plaintiff on Trilafon and Lithium.
*314 Dr. Brown was deposed on October 23, 1990. Like Dr. Chazin, he also testified that he was fully aware of the risk of NMS associated with Trilafon and that highlighting the risk of NMS in the drug's package insert or PDR reference would not have affected his judgment or decision to continue to treat plaintiff with Trilafon:
Q. Doctor, at the time you prescribed and continued the Trilafon for Nancy Strumph, were you aware that there was a risk of NMS, neuroleptic malignant syndrome, associated with that medication?
A. Yes.
....
Q. Knowing that, why did you prescribe Trilafon?
A. Because in this particular lady's case she seemed to be doing very well with it. There were no indications of any of those conditions at the time that I saw her. She seemed to be in good remission, and I felt that the risks outweighed the benefits  the benefits outweighed the risks.
Q. Doctor, did you read the PDR for Trilafon before you prescribed that medication to Nancy Strumph?
A. I can't say that I did or didn't.
Q. Okay.
A. I have read it at some time or another.
Q. Okay.
A. I can't say that I read it while she was here in the office.
....
Q. Doctor, knowing everything that you know today in 1990 about ... Trilafon and the risk of NMS, had you known everything that you know today back in 1986, would you still have prescribed Trilafon for Nancy Strumph?
A. Yes.
Q. Why?
A. Because she seemed to be tolerating it well and she was in good remission.
....
Q. Doctor, in 1986 was it common knowledge in the psychiatric community that NMS was a risk of Trilafon and other phenothiazines and perphenazines?
A. That's correct.
Q. And was it common knowledge in 1986 within the psychiatric community that NMS was severe and could potentially be fatal?
A. That's correct.
....
Q. Doctor, I'm going to show you the 1990 PDR for Trilafon. We can have this marked after the deposition. And, I'm going to direct your attention to the "warnings" section, and underneath that the listing of neuroleptic malignant syndrome which is in large darkened block letters. Do you see that?
A. Yes, I do.

*315 Q. Had the risk of NMS and the association with Trilafon been highlighted in 1986 just as it is in the 1990 PDR, would you still have prescribed Trilafon to Nancy Strumph?
A. Yes.
....
Q. Do you continue to use Trilafon for certain patients today?
A. Yes.
Q. Are those patients that you continue to use Trilafon today, are they patients similar to how Nancy Strumph was in June, 1986, when you saw her?
A. Yes.
Q. If you saw Nancy Strumph today, October 23, 1990, and you saw her under the exact circumstances that you saw her in 1986, in June 1986, and she was in the exact same condition that you saw her then today, would you have prescribed Trilafon and continued Trilafon today?
A. Yes, yes.
Based on the deposition testimony of Dr. Chazin and Dr. Brown, the trial judge concluded that plaintiff would be unable to establish that defendant's warning, if found to be inadequate, was a proximate cause of her condition. The trial judge noted that in New Jersey the learned intermediary rule applies in strict liability cases against drug manufacturers based on allegedly inadequate warnings. Under that rule, "a pharmaceutical manufacturer generally discharges its duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities." Niemiera v. Schneider, 114 N.J. 550, 559, 555 A.2d 1112 (1989). Thus, the manufacturer has no duty to warn the patient. Cf. N.J.S.A. 2A:58C-4; Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 130-131 (9th Cir.1968) (drug manufacturer has duty to warn consumer where drug "dispensed to all comers at mass clinics without an individualized balancing by a physician of the risks involved"). The trial judge reasoned, therefore, that whether a drug should be prescribed is left to the treating physician's judgment after considering the risks and benefits. Accordingly, he ruled that if the treating physicians testify that they were aware of the risks in 1986 and were aware of the enhanced 1990 warnings, but, nevertheless, would have prescribed Trilafon to plaintiff in light of her condition despite those risks, then the alleged inadequacy in 1986 of *316 defendant's warnings could not have been a proximate cause of plaintiff's injury.[3]
There is support for the trial judge's ruling. Plummer v. Lederle Laboratories, 819 F.2d 349 (2d Cir.), cert. denied, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), involved a plaintiff who contracted polio as a result of contact with his granddaughter within 30 days of her ingestion of defendant's oral polio vaccine. Contact polio was a recognized risk of oral polio vaccinations. Although defendant warned of the risk in its package inserts, plaintiff contended that the warning was inadequate because it improperly minimized the risk.
The Court of appeals reversed a judgment in favor of plaintiff entered on a jury verdict. It ruled that the warning was adequate and that plaintiff had failed to establish proximate cause. The court posited its proximate cause ruling on the treating physician's testimony that he was aware of the risk of contact polio, but made it a practice not to convey that information to patients or their parents. The Court of Appeals responded to plaintiff's argument that the doctor's testimony should not be credited:
According to Plummer, Dr. Cohen's testimony that he had a practice of failing to warn his patients of the risk of contact polio should not be credited because he was an interested witness. It may be true that Dr. Cohen was an interested witness, but his was the only testimony on the issue of proximate cause. Even if the jury failed to credit him, Plummer has not proven an essential element of his case. Furthermore, even if the warnings had been stronger, a reasonable jury could not have concluded that Dr. Cohen would have warned the vaccinee's mother. Thus, judgment notwithstanding the verdict should be entered for Lederle because a reasonable jury could not have found proximate cause.
819 F.2d at 359.
Stanback v. Parke, Davis and Co., 657 F.2d 642 (4th Cir.1981) involved a plaintiff who sustained a Guillain-Barre Syndrome (GBS) reaction following injection of influenza vaccine. *317 Defendant's 1976 package insert did not warn of a GBS risk. The trial court granted defendant summary judgment on the ground that defendant's failure to warn was not a proximate cause of plaintiff's injury. The trial court relied on the testimony of Dr. Edmunds, the physician who had injected the plaintiff with the flu vaccine. Dr. Edmunds stated in deposition testimony and in an affidavit that he had not read defendant's package insert, but knew of the risk of GBS associated with the flu vaccine; that it was not his practice and did not deem it necessary to advise patients about package insert warnings; and, that "it was true before the Guillian-Barre Syndrome [sic] warning in 1976 and it is true today." The trial court gave plaintiff an opportunity to submit proof that a reasonable physician would have treated her in a manner which would have avoided or reduced her injuries. Ultimately, however, the trial court concluded that plaintiff had failed to present adequate proof of causation.
In affirming, the Court of Appeals stated:
Given the peculiar facts of this case, we agree that there is not sufficient evidence of causation to allow the question to be put to a trier of fact. Dr. Edmunds testified in his deposition that he knew of the risk of GBS associated with the flu vaccines such as Fluogen at the time he vaccinated Mrs. Stanback. He also averred that he had not found it necessary and did not make it his practice to advise patients about the risks associated with flu vaccinations. Whatever may be said about Dr. Edmunds' policies and decisions from the standpoint of the patient, it is clear that they precluded Parke-Davis' failure to warn from having any effect whatsoever on Mrs. Stanback's injury. Even if Parke-Davis had fully warned Dr. Edmunds of any risk of GBS associated with flu vaccines at the time Mrs. Stanback received the second vaccination, the uncontradicted evidence establishes that Mrs. Stanback would have nevertheless received the flu vaccinations despite the slight risk, and would not have been informed of the risk. Dr. Edmunds' decisions and actions  made in full knowledge of the information which an adequate warning would have contained  therefore insulate Parke-Davis from any liability resulting from its failure to warn.
657 F.2d at 645. Cf. Kirsch v. Picker Intern. Inc., 753 F.2d 670 (8th Cir.1985) (judgment for defendant affirmed; treating physician already aware of cancer risk associated with radiation therapy to treat acne); Chambers v. G.D. Searle & Co., 441 F. Supp. 377, 384 (D.Md. 1975), aff'd o.b., 567 F.2d 269 (4th *318 Cir.1977) (evidence established that adequate warnings would have made no difference in light of treating physician's knowledge and conclusions); Spychala v. G.D. Searle & Co., 705 F. Supp. 1024, 1032 (D.N.J. 1988) (manufacturer not liable if physician had sufficient knowledge from other sources); Vaughn v. G.D. Searle & Co., 272 Or. 367, 536 P.2d 1247, 1249-50 (1975) (judgment of plaintiff reversed; physicians who were not told of plaintiff's symptoms could not have related any warning to plaintiff's case) cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831, 838 (Ohio 1981) (inadequate warning not proximate cause of injury where physician unaware of plaintiff's history of high blood pressure).
Seley, supra, involving oral contraceptives, rejected, however, defendant's contention that the treating physician's testimony precluded a finding of proximate cause. The physician testified that "he had acquired full knowledge from other sources of the increased risk of hypertension and stroke in women with a history of toxemia." The Ohio Supreme Court stated:
We reject this contention. A warning may serve purposes other than merely filling gaps in the intended recipient's knowledge  one may benefit from being warned or reminded of what he already knows. Similarly, only speculation can support the assumption that an adequate warning, properly communicated, would not have influenced the course of conduct adopted by a physician, even where the physician had previously received the information contained therein. "What the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case." Hamilton v. Hardy, supra, 37 Colo. App. [375] at page 387, 549 P.2d [1099] at 1099 [(1976)].
423 N.E.2d at 839. The court also observed in footnote five that:
We note also the unlikelihood of a physician, in effect, admitting his failure to remain informed of current medical and scientific developments where such an admission may be tantamount to an admission of malpractice.
Id.
In Williams v. Lederle Laboratories, 591 F. Supp. 381 (S.D.Ohio 1984) the trial court rejected a similar contention in denying defendant's motion for summary judgment. Williams *319 involved a plaintiff who had contracted polio through contact with her child shortly after the child received defendant's orally administered live trivalent polio vaccine. Dr. Furlong, the dispensing physician, testified that he knew of and understood the risks associated with the oral vaccine but chose not to warn plaintiff or other patients. Indeed, he testified that despite revision of the warnings and his knowledge of plaintiff's experience, he continued not to warn patients.
In the case at bar, Dr. Furlong admitted that despite knowing of the risk, he chose not to warn plaintiff of the risk of contact polio. Even if we assume that plaintiff had not been previously vaccinated against polio and thus was among those adults subject to an increased risk, it is not clear whether Dr. Furlong was aware of that aspect of her medical history. In other words, unlike the situation in Seley, it is not clear that a different warning would have made no difference in Dr. Furlong's decision. It is for the jury to determine whether an adequate warning would have made no difference in Dr. Furlong's decision to prescribe Orimune.

Defendant emphasizes Dr. Furlong's testimony that, despite revisions in the Orimune warnings and his own knowledge of plaintiff's experience, he continues not to warn of the risk of contact polio associated with Orimune. What Dr. Furlong might or might not have done involves to some degree his credibility. Thus, we conclude that it is for the jury to determine whether the presence of an adequate warning would have made no difference in Dr. Furlong's decision.
591 F. Supp. at 387 (Emphasis added).
Plaintiff must establish that she suffers from NMS and that Trilafon ingestion caused the NMS. She also must establish that defendant's 1986 warnings were inadequate and that their inadequacy was a proximate cause of the prescription of Trilafon by Chazin and Brown. Feldman v. Lederle Laboratories, 97 N.J. 429, 449, 479 A.2d 374 (1984); see Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 209, 485 A.2d 305 (1984); Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 402, 451 A.2d 179 (1982).
We conclude that summary judgment should not have been granted on the proximate cause issue.
Proximate cause traditionally is an issue reserved for the jury. Campos, supra, 98 N.J. at 209-10, 485 A.2d 305. In Campos, the Court remanded for a new trial and submission of *320 the proximate cause issue to the jury despite the injured worker's awareness, from a prior injury, of the danger of inserting his hand into a safety cage while a truck tire was being inflated and despite the Court's observation that "plaintiff made little, if any showing that with a proper warning the accident would not have occurred." Id. at 211, 485 A.2d 305. See also Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1 (1959) (whether tavern owners serving of alcohol to intoxicated patron was proximate cause of auto collision is a jury question); Butler v. Acme Markets, Inc., 177 N.J. Super. 279, 289, 426 A.2d 521 (App.Div. 1981) (causal relationship between inadequate security measures and criminal attack was "clearly for the jury"), aff'd, 89 N.J. 270, 445 A.2d 1141 (1982); cf. Michalko, supra, 91 N.J. at 402, 451 A.2d 179. But cf. Vallillo v. Muskin Corp., 212 N.J. Super. 155, 514 A.2d 528 (App.Div. 1986) (plaintiff's admitted knowledge that diving into shallow water was dangerous precluded finding of proximate cause), certif. denied, 111 N.J. 624, 546 A.2d 540 (1988).
The credibility of a witness' testimony is a jury function where there is "ground for hesitating to accept it as the truth." Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 498, 126 A.2d 323 (1956); cf. Langley v. Allstate Ins. Co., 206 N.J. Super. 365, 369, 502 A.2d 1162 (App.Div. 1985) (plaintiff's proofs, though uncontradicted, could be rejected by trier of fact). In the present case, the testimony of Dr. Chazin and Dr. Brown coincided with their best interests. In the normal course of human behavior one would not expect a physician to admit that he was not well informed regarding a powerful chemical compound he was dispensing to a patient or to admit that the medicine he prescribed was not the most appropriate alternative. See Seley, supra, 423 N.E.2d at 839, n. 5. This is especially so in the present case because plaintiff alleges that defendant failed to warn adequately of facts known to the scientific and medical community.
*321 A well-prepared advocate may be able to erode at trial the physicians' testimony in this regard. Their deposition testimony was based on direct questioning by defendant's attorney. We do not know whether and to what extent plaintiff's counsel engaged in cross-examination. We do not know whether plaintiff's counsel had been aware, prior to the deposition, of the content of the physician's testimony and, therefore, we cannot determine whether he was prepared to engage in effective cross-examination. We note that the Chazin/Brown deposition testimony lacked detail regarding their knowledge of the severity of NMS symptoms, the mortality rate associated with NMS, the probability that a patient will contract NMS, and whether the risk is enhanced or diminished based on factors such as age or sex. Critical portions of their testimony were responses to hypothetical questions. We also observe that pre-trial depositions are a discovery device and not an opportunity to try the case. See Ferdinand, supra, 22 N.J. at 497, 126 A.2d 323 (incompleteness of uncontradicted testimony may create jury question). Moreover, as previously indicated, the interests of Chazin and Brown coincided with defendant's interests and, therefore, it was unlikely that plaintiff could obtain helpful affidavits from the physicians to present to the trial court in opposition to the summary judgment motion.
Finally, this is not a case in which plaintiff is depending on the jury's rejection of Chazin's and Brown's credibility to provide evidence of proximate cause. See Plummer, supra, 819 F.2d at 359. To carry her burden of establishing proximate cause, plaintiff relied on the reports and deposition testimony of Dr. Rushton, one of her treating physicians. He testified as follows:
Q. Doctor, are you saying that if that had been done, the prescribing physician would not have given the medication?
A. I would say yes, I would say that the use of certain drugs would have diminished more than they did. They already, we already know that they diminished quite a bit because of the knowledge but see, the drug company is in a very interesting position. They receive  they receive information from practicing doctors world over, letters of observation, letters about this problem *322 and they begin to evaluate that but they're having input, they had input about the neuro-malignant syndrome for 15 years, and it's the way they saw it, they kept it in the book but time has demonstrated that they had quite adequate evidence that was frightening and they should have said we better raise a red flag here, this drug, even though it's a good drug, has a severe potential. You know, would you give this drug to your daughter or your wife or your mother? You wouldn't do it.
Q. What if they required it?
A. That would be after the other drugs. It would say use this drug as last resort and they never came out and said that, but they had all the information for years pouring into their division headquarters.
....
Q. Right.
A. And concern on our part that this thing, this thing can happen and with a serious reaction, it is, it does happen. So we gradually became aware of it and became fearful of it and in my mind, I try to avoid that potential problem. So I have veered away from Trilafon and Prolixin drugs like that on that end of that spectrum.
Q. I asked you before whether back in 1986 it was appropriate to begin Trilafon before Thorazine and Mellaril, and I think you indicated that you yourself would have started Thorazine before Trilafon back in 1986 because Trilafon had more risks than Thorazine?
A. Yes.
Q. Okay. So that in 1986, you were aware of the increased risks associated with Trilafon, Stelazine, Haldol and Prolixin versus Thorazine and Mellaril. Am I correct?
A. In my mind, yes.
Q. Okay.
A. Yes.
Q. And one of those risks would also include NMS?
A. Yes.
Q. In 1986, were you beginning to try to steer away from Trilafon, Stelazine, Haldol and Prolixin?
A. I would say I did, I did that.
Q. And that was because in 1986, you were aware of the increased risks associated with these drugs?
A. Yes.
Dr. Rushton repeated this theme in one of his reports:
In my expert opinion, Schering Corporation was very much reluctant to inform physicians of the very real danger of using Trilafon in the treatment of their patients. The Neuroleptic Malignant Disorder is a horrible complication and one severe enough as to make the use of Trilafon basically undesirable. I avoid *323 the use of Trilafon, turning to medicine less predisposed to bring on a Neuroleptic Malignant Syndrome.
This is an appeal from a summary judgment, and, therefore, we apply the familiar admonitions that "it is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact," that "[a]ll inferences of doubt are drawn against the movant in favor of the opponent of the motion," and that "papers supporting the motion are closely scrutinized and the opposing papers indulgently treated." Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 74-75, 110 A.2d 24 (1954). "Issues of credibility are ordinarily for the trier of fact and the judge does not function as a trier of fact in determining a motion for summary judgment." Id. at 75, 110 A.2d 24.
We are satisfied that Dr. Rushton's testimony, treated indulgently, sufficiently controverts Chazin's and Brown's deposition testimony to create an issue of material fact and enhances the need to assess their credibility. Based on these factors and the other considerations discussed above, we conclude that summary judgment should not have been granted.
Reversed and remanded for further proceedings.
SKILLMAN, J.A.D., dissenting.
Plaintiff has the burden of proving that defendant's alleged inadequate warnings were a proximate cause of her injuries. Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 209, 485 A.2d 305 (1984). To satisfy this burden, plaintiff must show that adequate warnings would have altered her doctors' decision to prescribe Trilafon. Thomas v. Hoffman-LaRoche, Inc., 949 F.2d 806 (5th Cir.1992). Absent any evidence from which a jury could reasonably make this finding, defendant was entitled to summary judgment. Vallillo v. Muskin Corp., 212 N.J. Super. 155, 161-63, 514 A.2d 528 (App.Div. 1986) certif. denied, 111 N.J. 624, 546 A.2d 540 (1988).
At their depositions, which are quoted at length in the majority opinion, Drs. Chazin and Brown unequivocally denied that *324 defendants' warnings in the Physician's Desk Reference (PDR) had any effect on their decisions to prescribe Trilafon for plaintiff. Dr. Chazin testified that he had not even read the PDR entry for Trilafon. Instead, he gained his knowledge about neuroleptic medications, including Trilafon, from his formal education in psychiatry, his review of the literature in pharmacology and psychiatry and his own clinical experience. Dr. Chazin also testified that his knowledge of the effects of Trilafon included an awareness of the risk of neuroleptic malignant syndrome (NMS) and that NMS could be fatal. Although Dr. Brown testified that he had read the PDR entry for Trilafon at some time or another, he did not indicate that it had affected his decision to prescribe the drug for plaintiff. In addition, Dr. Brown testified that the risk of Trilafon causing NMS and that NMS could be fatal were "common knowledge in the psychiatric community" in 1986. This assertion was not disputed by either of plaintiff's experts. The doctors also testified that even if they had read all the information contained in the 1990 PDR entry for Trilafon, which plaintiff's experts admitted contained adequate warnings, this would not have changed their decisions to prescribe the drug for plaintiff. Finally, both doctors testified that they still prescribe Trilafon for patients with conditions similar to plaintiff's condition in 1986.
It is firmly established that "where the uncontradicted testimony of a witness, interested or otherwise, is unaffected by any conflicting inferences to be drawn from it and is not improbable, extraordinary or surprising in its nature, or there is no other ground for hesitating to accept it as the truth, there is no reason for denying the verdict dictated by such evidence." Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 498, 126 A.2d 323 (1956); accord Johnson v. Salem Corp., 97 N.J. 78, 92-93, 477 A.2d 1246 (1984). The majority concludes that there is sufficient ground for "hesitating to accept [the doctor's testimony] as the truth," Ferdinand, supra, *325 22 N.J. at 498, 126 A.2d 323, because that testimony "coincided with their best interests." Ante at 320, 606 A.2d at 1146. The majority goes on to state, relying upon Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 423 N.E.2d 831, 839 n. 5 (1981), that "[i]n the normal course of human behavior one would not expect a physician to admit that he was not well informed regarding a powerful chemical compound he was dispensing to a patient or to admit that the medicine he prescribed was not the most appropriate alternative." Ante at 320, 606 A.2d at 1146.
However, the majority does not explain how a doctor's statement that he did not read the PDR or was not influenced by its contents coincides with the doctor's "best interests." It seems to me equally plausible that a doctor would consider it to be in his best interests to say he was familiar with and influenced by all available sources of information regarding the drug, including the PDR. In that way the doctor could maintain that it was proper to prescribe the drug while suggesting that the drug manufacturer shared responsibility for his decision. I also note that plaintiff has not filed a malpractice claim against either doctor and that the doctors have no relationship with the drug manufacturer which would be likely to generate any bias in its favor. Therefore, in my view Drs. Chazin and Brown do not have an evident "self interest" in testifying that their decision to prescribe Trilafon was unaffected by defendant's warnings and hence plaintiff failed to establish a jury issue regarding their credibility.
Furthermore, even if there were a basis for doubting the credibility of the doctors' deposition testimony, such doubts would not provide a sufficient foundation for an affirmative jury finding that plaintiff established by a preponderance of the evidence that more prominent warnings of the risks in the PDR would have altered the doctors' decision to prescribe Trilafon. "Normally ... discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 512, *326 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502, 524 (1984). "Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct 2505, 2514, 91 L.Ed.2d 202, 217 (1986); accord Walter v. Fiorenzo, 840 F.2d 427, 434-35 (7th Cir.1988); Herrick & Smith v. NLRB, 802 F.2d 565, 568 (1st Cir.1986); Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir.1952); see also Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., supra, 22 N.J. at 489, 496-97, 126 A.2d 323; Martin B. Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745 (1974).
This principle was relied upon in Plummer v. Lederle Laboratories, 819 F.2d 349 (2d Cir.1987), cert. denied, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), in which the court rejected plaintiff's argument that he could establish the requisite causal relationship between a drug manufacturer's alleged inadequate warning of the risk of contracting contact polio and the prescribing doctor's failure to convey any information regarding this risk to the patient based solely on the jury's disbelief of the doctor's testimony:
According to [plaintiff], [the prescribing doctor's] testimony that he had a practice of failing to warn his patients of the risk of contact polio should not be credited because he was an interested witness. It may be true that [the prescribing doctor] was an interested witness, but his was the only testimony on the issue of proximate cause. Even if the jury failed to credit him, [plaintiff] has not proven an essential element of his case. [Id. at 359].
The majority suggests that the doctors' deposition testimony is incomplete because plaintiff's counsel may have been unaware, prior to the deposition, of the content of that testimony and therefore may not have been prepared to engage in effective cross-examination. Ante at 321, 606 A.2d at 1146. If plaintiff had not completed discovery before defendant made its motion for summary judgment or if the motion indicated that further exploration of the facts would be desirable, I would not hesitate to remand the matter for further discovery, including additional depositions of Drs. Chazin and Brown. Cf. Bilotti v. Accurate Forming Corp., 39 N.J. 184, 193, 188 A.2d 24 (1963). However, plaintiff did not oppose defendant's motion on the *327 ground that discovery was incomplete nor has she requested this court to remand the matter to afford her an opportunity to redepose her doctors. Therefore, I believe we should assume plaintiff's attorney had an adequate opportunity during the doctors' depositions to ask any questions which he thought were relevant to plaintiff's claim. Surely, plaintiff should not be allowed to defeat a motion for summary judgment and obtain a jury trial based solely on this court's perception that her attorney's questioning of witnesses during depositions was inadequate.[1]
The majority contends that a jury could find proximate cause based on the testimony of one of plaintiff's other treating physicians, Dr. Rushton, considered in conjunction with its disbelief of the testimony of Drs. Chazin and Brown. However, the majority does not explain how Dr. Rushton's testimony is relevant to the issue of whether Drs. Chazin and Brown relied upon defendant's PDR entry for Trilafon in prescribing that drug for plaintiff. Although Dr. Rushton testified that he avoided using Trilafon and other similar drugs except as a last resort, he did not testify that Drs. Chazin and Brown deviated from an accepted standard of care in the medical profession in prescribing Trilafon to plaintiff. See Fernandez v. Baruch, 52 N.J. 127, 131, 244 A.2d 109 (1968) ("expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness."). He also failed to identify any specific information regarding Trilafon of which Drs. Chazin and Brown were unaware and which would have been likely to affect their decision to prescribe the drug for plaintiff. Thus, Dr. Rushton's testimony does not contradict the deposition testimony of Drs. Chazin and Brown relating to proximate causation.
*328 Finally, I note that most jurisdictions which have considered the question have concluded that a defendant drug manufacturer may not be held liable for an alleged inadequate warning where the only evidence on the issue of causation is the prescribing doctor's unequivocal testimony that his or her decision to prescribe the drug was not affected by the warning. See, e.g., Thomas v. Hoffman-LaRoche, Inc., supra, 949 F.2d 806; Stanback v. Parke, Davis & Co., 657 F.2d 642, 645-46 (4th Cir.1981); see also Plummer v. Lederle Laboratories, supra, 819 F.2d 349; Kirsch v. Picker International, Inc., 753 F.2d 670, 671-72 (8th Cir.1985); Spychala v. G.D. Searle & Co., 705 F. Supp. 1024, 1032 (D.N.J. 1988); Felix v. Hoffman-LaRoche, 540 So.2d 102, 105 (Fla. 1989). Contra Williams v. Lederle Laboratories, 591 F. Supp. 381, 386-88 (S.D.Ohio 1984); Seley v. G.D. Searle & Co., supra, 423 N.E.2d 831.
Therefore, I would conclude that plaintiffs failed to present any evidence from which a jury could reasonably find that the alleged inadequacy of defendant's warnings regarding Trilafon affected the decision of plaintiff's doctors to prescribe the drug for plaintiff and that the trial court properly granted summary judgment.
NOTES
[1] The term is used by one of plaintiff's experts.
[2] We are merely summarizing plaintiff's contentions and are not implying that we have a position regarding the adequacy of the 1986 warnings.
[3] The trial court did not rule that the physician's awareness of the risks exonerated defendant from the fulfillment of its duty to provide adequate warnings.
[1] I note that neither party furnished us with complete transcripts of the doctors' depositions. I believe the court should at least obtain these transcripts and review their contents before assuming any inadequacy in the doctors' depositions.