290 N.J. Super. 318 (1996)
675 A.2d 1133
CATHY A. LONDON, PLAINTIFF-RESPONDENT CROSS-APPELLANT,
v.
LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID COMPANY, DEFENDANT-APPELLANT, CROSS-RESPONDENT, AND E.R. SQUIBB & SONS, INC., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued March 26, 1996.
Decided April 30, 1996.
*321 Before DREIER, ARNOLD M. STEIN and KESTIN, JJ.
William C. Slattery, argued the cause for appellant (Slattery & McElwee, attorneys; Kevin R. Jespersen, on the brief).
James I. Peck, IV, argued the cause for respondent.
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant, Lederle Laboratories, appeals from a judgment in favor of plaintiff Cathy A. London in the net amounts of $43,200 for dental expenses and $7500 for past and future pain, suffering and emotional distress. Plaintiff cross-appeals from the amount of the judgment and requests additur, a new trial, and a further remand for a jury to determine whether punitive damages should be awarded.
The underlying facts are those of a typical damage claim based upon tetracycline having stained plaintiff's teeth when she was a young child. See, e.g., Savage v. Old Bridge-Sayreville Med. Group, 134 N.J. 241, 633 A.2d 514 (1993); Feldman v. Lederle Labs., 132 N.J. 339, 625 A.2d 1066 (1993); Apgar v. Lederle Labs., *322 123 N.J. 450, 588 A.2d 380 (1991). A companion case, Batson v. Lederle Labs., 290 N.J. Super. 49, 674 A.2d 1013 (App.Div. 1996), also decided by us today, involves a similar claim by plaintiffs sister.[1]
Plaintiff, Cathy London, was born October 1, 1957. As a child, she periodically suffered from upper respiratory infections. During the first ten years of years of her life, she was treated for these illnesses exclusively by the family physician, Robert L. Pierce, M.D.
Dr. Pierce regularly treated childhood infections with a particular class of antibiotics known as tetracycline. On fourteen different occasions from January 8, 1958 through September 4, 1964, Dr. Pierce prescribed various brands of tetracycline to treat plaintiff's infections; he specifically prescribed brands of tetracycline manufactured by defendant Lederle on eleven of those occasions. Until February 4, 1963, Dr. Pierce had prescribed for plaintiff only Achromycin and Declomycin, both of which are Lederle products. Thereafter, on April 4, 1963 and September 4, 1964, he supplied plaintiff with prescriptions for Terramycin, a Pfizer drug, and on May 6, 1964 he prescribed Mysteclin F, a Squibb product. Overall, plaintiff received tetracycline prescriptions twice in 1958, four times in 1959, twice in 1960, once in 1961, once in 1962, twice in 1963 (one time from Lederle; one time from Pfizer), and twice in 1964 (one time from Squibb; one time from Pfizer).[2]
*323 The ingestion of tetracycline drugs, particularly during the period from birth through the time a child is approximately eight years old, has the capacity to stain and discolor bones and teeth. Plaintiff's teeth exhibit the type of staining associated with the use of tetracycline.
At trial, Dr. Pierce testified that he would not have prescribed Achromycin and Declomycin when he did if he had been aware of their side effects, unless "due to other circumstances you can't use anything but." However, at a 1989 pre-trial deposition, the doctor had agreed that he was aware of the correlation between tetracycline and tooth-staining in March of 1964, prior to the time he prescribed the Squibb and Pfizer products. This statement was brought to the jury's attention during the doctor's cross-examination. The doctor further agreed that plaintiff had never presented an illness that would require him to "override [his] best judgment and use tetracycline to treat her although [he] knew that it was possibly going to stain [plaintiff's] teeth."
Plaintiff testified that other children teased her about the discoloration of her teeth and she grew to be extremely self-conscious about smiling, shy and withdrawn. She would like to have had her teeth capped, but could not afford the cost due to her low-wage jobs. She is college educated, and originally considered a teaching career, but rejected teaching because of her shyness. Plaintiff's prosthodontist estimated that capping her entire mouth would cost $28,800 and that the caps would have to be replaced "a couple of times" or "several times." He estimated that the caps provided in each procedure would have lasted ten years.
The jury was presented with a series of twelve special interrogatories on which they noted their verdict. The interrogatories, along with the verdicts, are as follows:
1. WHEN DID LEDERLE HAVE ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE TOOTH STAINING EFFECT OF TETRACYCLINE?

*324 APPROXIMATE DATE: 58/59
2. DID LEDERLE ACT REASONABLY IN AWAITING FDA APPROVAL BEFORE ISSUING A WARNING FOR TETRACYCLINE?
 YES: NO: X
IF YOUR ANSWER TO QUESTION # 2 IS "YES"  STOP  YOU HAVE REACHED A VERDICT FOR DEFENDANT
3. FOR EACH INGESTION OF TETRACYCLINE DID CATHY LONDON'S TREATING PHYSICIAN PRESCRIBE IT FOR ITS INTENDED PURPOSE OR IN A WAY THAT WAS REASONABLY FORESEEABLE TO LEDERLE?
 YES: NO: X
IF YOUR ANSWER TO QUESTION # 3 IS "NO" AS TO ANY INGESTION ANSWER QUESTION # 4
4. IF YOUR ANSWER TO QUESTION # 3 IS "NO" PLEASE INDICATE ON WHICH OF THE INGESTION DATES THAT CATHY LONDON'S TREATING PHYSICIAN FAILED TO PRESCRIBE TETRACYCLINE FOR ITS INTENDED PURPOSE OR IN A WAY THAT WAS NOT REASONABLY FORESEEABLE TO LEDERLE.
 ALL INGESTIONS:
 SOME INGESTIONS: X
IF SOME, PLEASE SPECIFY DATES:
 5-6-64
 9-4-64
5. WERE THE INGESTIONS OF TETRACYCLINE, MANUFACTURED BY LEDERLE, A SUBSTANTIAL FACTOR IN THE OVERALL STAINING OF PLAINTIFF'S TEETH?
 YES: X NO:
6. IF THE ANSWER TO QUESTION # 5 IS "YES" PLEASE INDICATE WHICH OF THE INGESTIONS INDICATED IN RESPONSE TO QUESTION # 4, BY DATE, WERE A SUBSTANTIAL FACTOR IN STAINING PLAINTIFF'S TEETH.
 ALL INGESTIONS: X
 SOME INGESTIONS: ____
*325 IF SOME, PLEASE SPECIFY DATES:
7. DID PLAINTIFF PROVE THAT A PORTION OF THE TOOTH STAINING, WHICH RESULTED FROM AN INGESTION OF LEDERLE PRODUCTS OCCURRED WHILE THE PRODUCT MANUFACTURED BY LEDERLE WAS DEFECTIVE?
 YES: X NO:
IF "NO"  STOP  YOU HAVE REACHED A VERDICT FOR DEFENDANT
8. IF YOUR ANSWER TO QUESTION # 7 IS "YES" WHAT PERCENTAGE OF THE TOTAL TEETH STAINING EXISTED WHILE THE PRODUCT MANUFACTURED BY LEDERLE WAS DEFECTIVE?
50%
9. HAD AN ADEQUATE TOOTH STAINING WARNING BEEN GIVEN BY LEDERLE, WOULD CATHY LONDON'S TREATING PHYSICIAN HAVE PRESCRIBED TETRACYCLINE TO PLAINTIFF CATHY LONDON ANYWAY?
 YES: 7 [SIC] NO:
10. WHAT AMOUNT OF MONEY WOULD REASONABLY COMPENSATE PLAINTIFF FOR HER REASONABLE DENTAL EXPENSES OVER HER PROJECTED LIFETIME?
$86,400 LESS 50% PER QUESTION # 8
11. WHAT AMOUNT OF MONEY WILL REASONABLY COMPENSATE PLAINTIFF FOR BOTH HER PAST AND FUTURE PAIN, SUFFERING AND EMOTIONAL DISTRESS?
$15,000
12. DID PLAINTIFF PROVE BY A PREPONDERANCE OF THE CREDIBLE EVIDENCE THAT DEFENDANT WAS GUILTY OF CONDUCT SUCH AS TO JUSTIFY AN AWARD OF PUNITIVE DAMAGES?
 YES: NO: X
IF YOUR ANSWER TO # 12 IS "YES" 
[*] DO NOT AWARD A SPECIFIC AMOUNT OF MONEY AT THIS STAGE AS TO PUNITIVE DAMAGES
*326 The sum of the jury's responses awarded plaintiff a total of $50,700 (one-half of $101,400).

a.
In its response to interrogatory number nine, the jury found that plaintiff's treating physician would have prescribed "tetracycline" to her even if he had received an adequate tooth-staining warning from Lederle. Defendant argues that this result negates proximate cause in that it constitutes a finding that defendant's failure to warn could not have been a substantial factor in plaintiff's injuries because even a timely warning would not have been heeded. Defendant contends that since plaintiff failed to prove proximate cause, judgment should have been entered in its favor.
The jury's conclusion that Dr. Pierce would have prescribed tetracycline despite a warning from Lederle must be read in conjunction with its findings on question four. There, it responded that Dr. Pierce "failed to prescribe tetracycline for its intended purpose or in a way that was not reasonably foreseeable to Lederle" on May 6, 1964 and on September 4, 1964 (after he received Lederle's warning in March of 1964). On these dates, he prescribed non-Lederle products, but the jury apparently reasoned that Lederle's warning would not have altered the doctor's behavior on these dates because there was evidence that he continued to prescribe tetracycline. But nowhere did the jury find specifically that Dr. Pierce would have prescribed tetracycline for plaintiff from birth to eight years of age had he known of the harmful effect. The jury may have meant to express this by its answer; it might also have just answered the interrogatory literally.
A plaintiff asserting a cause of action based on failure to warn must establish all the same elements required for an action based on a defective product. Coffman v. Keene Corp., 133 N.J. 581, 594, 628 A.2d 710 (1993). Thus, plaintiff must prove that the product was defective, that the defect could cause injury to a reasonably foreseeable user, and that the defect was the proximate *327 cause of the plaintiff's damages. Id. at 593-94, 628 A.2d 710; Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 241, 432 A.2d 925 (1981). Generally, a product is considered to be defective when it is not "reasonably fit, suitable and safe for its intended or foreseeable purposes." Freund v. Cellofilm, 87 N.J. at 242, 432 A.2d 925 (quoting Suter v. San Angelo Foundry & Mach Co., 81 N.J. 150, 176, 406 A.2d 140 (1979)). In a failure-to-warn case, the defect consists of the absence of a warning concerning the product's potential for injury, and the plaintiff must prove that the warning's absence was a proximate cause of the harm. Coffman v. Keene Corp., 133 N.J. at 593-94, 628 A.2d 710; see N.J.S.A. 2A:58C-2. Where the failure-to-warn case involves a prescription drug, the issue is whether the warning should have been given to the prescribing physician; there is no requirement that the manufacturer warn the patient herself. N.J.S.A. 2A:58C-4.
The plaintiff in a product defect case also has the burden of showing that the product was not misused or, if it was, that the misuse was objectively foreseeable. Jurado v. Western Gear Works, 131 N.J. 375, 386, 619 A.2d 1312 (1993). Evidence of a plaintiff's misuse of a product is relevant to the issue of proximate cause because it may establish that the plaintiff's conduct was the cause-in-fact of the injury. Johansen v. Makita U.S.A., Inc., 128 N.J. 86, 92, 102, 607 A.2d 637 (1992); see also, Jurado, 131 N.J. at 387, 619 A.2d 1312. In a non-drug case, the relevant evidence of "misuse" would include a showing that the plaintiff either disregarded an adequate warning or would have done so had the warning been given. See Coffman, 133 N.J. at 604, 628 A.2d 710; Calderon v. Machinenfabriek Bollegraaf Appingedam BV, 285 N.J. Super. 623, 631-636, 667 A.2d 1111 (App.Div. 1995), certif. denied, 144 N.J. 174, 675 A.2d 1122 (1996); Strumph v. Schering Corp., 256 N.J. Super. 309, 328, 606 A.2d 1140 (App.Div. 1992) (Skillman, J.A.D., dissenting), rev'd on dissent, 133 N.J. 33, 626 A.2d 1090 (1993). In a prescription drug warning setting, a defendant drug manufacturer may not be held liable where the doctor testifies unequivocally that his or her decision to prescribe *328 the drug would not have been affected by the warning. Strumph, 256 N.J. Super. at 328, 606 A.2d 1140.
The jury's response to interrogatory number four indicates that it believed the doctor's issuance of the prescriptions on those dates constituted a misuse of tetracycline: he had not used the drugs for its intended purpose or in a way reasonably foreseeable to Lederle. However, Dr. Pierce prescribed Squibb and Pfizer tetracycline on those dates, not Lederle products.[3] Interrogatory nine neglected to provide the jury with a proper framework to consider the doctor's conduct because it contained the word "tetracycline," in lieu of "Lederle's product." The broad wording of question nine could be read as asking if the doctor, after Lederle's warning, would have prescribed tetracycline to plaintiff at any age, under any circumstances. The jury determined in question one that Lederle had become aware of the dangers of tetracycline in 1958-59, at the very time plaintiff began to receive the first of her many prescriptions. The doctor also testified that, during the times he was prescribing Lederle's drugs, plaintiff had never faced an illness so serious that he could not have used other drugs. The interrogatory as worded, however, did not ask the jury to answer the real question: whether Dr. Pierce would have prescribed the drugs to a one year old child for relatively minor ailments, and whether he would have continued to do so throughout her childhood if he had received the warning at the time Lederle knew of *329 the danger. Instead, the question invited speculation. A more appropriate interrogatory might have read:
Had an adequate tooth staining warning been given by Lederle in [1958/59], would Cathy London's treating physician have prescribed Achromycin and Declomycin to plaintiff at the times he did, and for the ailments he diagnosed on those occasions?
The jury never passed judgment on the issue of whether Dr. Pierce would have prescribed the drug in the manner he did, the manner that actually caused the harm, if he had received the warning. The jury therefore never rendered a verdict on the issue of whether the absence of a warning regarding defendant's products was the proximate cause of plaintiffs harm. Since a jury verdict on an essential ingredient of plaintiff's cause of action is lacking, we must reverse and remand on this issue.

b.
In awarding plaintiff $86,000 compensatory damages in question ten, the jury also determined that the amount should be "less 50% per question # 8." In question eight, the jury responded that 50% "of the tooth staining existed while the product manufactured by Lederle was defective." It is unclear exactly what question eight asked the jury to determine. Was the jury being asked whether some of the tooth staining occurred after the warning, or before the time Lederle became aware of the dangers and therefore was required to provide the warning? If so, the jury's response appears inconsistent with its responses to other questions. Only two of the relevant fourteen ingestions occurred after the warning, and those were from other manufacturers. The jury had determined that all the ingestions of defendant's products were a substantial factor in causing the harm (question six), and it had replied that defendant had knowledge of the danger in 1958/59 (question one). Giving defendant the benefit of the doubt on the imprecise dates by excluding the 1958 dosages, still leaves defendant as having supplied a total of nine out of the remaining twelve ingestions from 1959 to 1964 (including those given after the warning), or nine out of ten ingestions from 1959 to 1964 (excluding those given after the warning). The amount of the reduction *330 is therefore inconsistent with the jury's answers to other interrogatories.
The answer could be explained by the jury's finding that the condition was progressive, with the final two doses having far greater effect than the earlier ten and thus being responsible for half of the damages. Defendant suggests this in its brief. It should be noted, however, that defendant mischaracterizes Dr. Haupt's testimony as suggesting that the later doses were "the straw that broke the camel's back." In fact, Dr. Haupt testified:
It is somewhat akin to, gosh, the straw that broke the camel's back. You know, you can't say any one particular straw did it but when you have enough of it one on top of the other then you have the effect.
At no point does Dr. Haupt say, as defendant does in its brief, that "the addition of the staining from the late ingestions disproportionately increases the visibility of the stain." Instead, the doctor testified that a "short course may indeed escape clinical staining." However, plaintiff had eleven prescriptions for defendant's products over the first six years of her life, and there was no testimony that such a pattern constituted a "short course." Thus, it was more likely that one of defendant's doses was the proverbial straw. In fact, Dr. Haupt testified that, after initial formation, teeth develop from the outside in, so that earlier ingestions of the drug between the ages of one and five would have had greater effect. Perhaps the jury found that the earlier doses created one-half of the total staining, including even the portion attributable to later silver/amalgam fillings, but we cannot tell from this interrogatory answer.
Finally, in halving the award in question ten, the jury definitely misunderstood or disregarded the judge's charge. He had explicitly told them not to apply any percentages to the award, but he did so in language that repeatedly referred to reducing the award by fifty percent. While it is clear that the jury in its answer to interrogatory number ten took a step the judge had told them not to take, stating that the award should be halved, that small error is harmless as it is an expected result of our giving juries *331 "ultimate outcome" charges. See Roman v. Mitchell, 82 N.J. 336, 345-347, 413 A.2d 322 (1980).
The judge is permitted to comment on and assess evidence, "as long as he leaves to the jury the ultimate determination of the facts, and rendering of the verdict on the facts as it finds them." He did so here. State v. Ward, 57 N.J. 75, 79, 270 A.2d 1 (1970); see also Weed v. Casie Enters., 279 N.J. Super. 517, 529-30, 653 A.2d 603 (App.Div. 1995); Graves v. Church & Dwight Co., Inc., 267 N.J. Super. 445, 467, 631 A.2d 1248 (App.Div.), certif. denied, 134 N.J. 566, 636 A.2d 523 (1993); Dafler v. Raymark Indus., Inc., 259 N.J. Super. 17, 37, 611 A.2d 136 (App.Div. 1992), aff'd o.b., 132 N.J. 96, 622 A.2d 1305 (1993). However, his repeated references to the fifty percent figure had a potential to influence the jury in this case because the jury had heard testimony that silver/amalgam fillings in half of plaintiff's teeth may have stained those teeth irrespective of the tetracycline use. The jury's response simply may have been an expression of its acceptance of that testimony. But, once again, the imprecise wording of the interrogatories leaves us unable to determine the jury's verdict on an issue. A more accurate interrogatory number eight might have asked the jury, "What portion, if any, of plaintiff's tooth staining was caused by, or, can be attributed to plaintiff's use of Achromycin and Declomycin during the period when Lederle's product lacked adequate warnings?"
The judge explained his denial of additur on the fifty percent reduction by saying that the jury was "very clear." We, however, do not see this clarity and remain confused. Interrogatory eight as written and answered was so ambiguous that the fifty percent figure itself must be rejected. On remand, if damages are awarded, allocation should be made pursuant to a properly worded special interrogatory.

c.
Plaintiff next argues that the jury's $15,000 award for past and future pain and suffering is so "shockingly insufficient" *332 that it requires that this court grant additur or a new trial on damages, both of which were denied by the trial court. A trial court should not interfere with a jury's damage award unless the award is so disproportionate as to "shock the conscience" and the result therefore "manifestly unjust." Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 297, 579 A.2d 1241 (1990); Baxter v. Fairmont Food Co., 74 N.J. 588, 603-604, 379 A.2d 225 (1977). Under R. 4:49-1(a), it must "clearly and convincingly appear that there was a miscarriage of justice under the law." "The same standard applies to an appellate court reviewing a trial judge's determination, except that the trial court's opportunity to develop a `feel of the case' is entitled to deference." Amaru v. Stratton, 209 N.J. Super. 1, 21, 506 A.2d 1225 (App.Div. 1985) (quoting Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969)).
Acknowledging that the verdict was low, the trial judge observed that plaintiff "was such a stoic ... the sad thing is there might have been by virtue of the fact that she  these green teeth warped her for life...." The judge said the verdict "almost" shocked him and he was "not comfortable" with the decision, but he was not inclined to change it.
Plaintiff had held several low-paying jobs with periods of unemployment. Although she had trained to be a physical education teacher, she testified that she had had difficulty teaching classes because she was very self-conscious about her appearance and her teeth. At the time of the trial, plaintiff worked in a factory job in Maine. Unfortunately, much of the evidence plaintiff presented regarding her general shyness could have applied to many people. She also did not show any evidence regarding the salary difference between a teacher and someone doing her job. Her condition was not physically painful, nor are the future treatments she would have to endure. We have examined all New Jersey cases dealing with tetracycline to see if there is a range of damages to which we can compare this award. We have found none. From out-of-state authority there is only one case that discusses the subject. In Kliebert v. Upjohn Co., 915 F.2d 142 (1990), vacated and dismissed *333 on settlement, 947 F.2d 736 (5th Cir.1991), the court was concerned with whether a plaintiff's damage claim of $10,000 was reduced to frustrate defendant's efforts to transfer the matter to the federal court under its diversity jurisdiction that required an amount in controversy over $10,000. The plaintiff had, however, offered to settle for that amount. The defendant made a survey of awards for tetracycline tooth-staining, and found a range of recovery from $65,000 to $110,000, depending upon the severity of the discoloration. Id. at 147.
Here the total award was $101,400 before the damages were halved. Even considering the inflationary factor between the 1990 decision in Kliebert and the 1994 trial in this case, plaintiff's award was on the high side of the range described in Kliebert and therefore not so shockingly low as to satisfy the additur or new trial standards of R. 4:49-1(a).

d.
Plaintiff lastly contends that because Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 346, 627 A.2d 1081 (1993) required that she present her claims for compensatory and punitive damages in bifurcated trials, she had not attempted during the trial to present complete evidence on the punitive damages issue. Defendant argues that plaintiff nevertheless had presented evidence which she hoped would support a punitive damages claim and so she is not entitled to a separate trial on the issue. The trial court mistakenly believed that separating the claims would eventually require three trials, and it allowed the jury to consider the liability portion of both the punitive damage and compensatory damage issues at the same time.
Plaintiff acknowledges that, since her claim was filed in 1986, her case arises prior to the July 22, 1987 effective date of the Products Liability Act which would have statutorily required a bifurcated trial. See N.J.S.A. 2A:58C-5 (amended by Punitive Damages Act, L. 1995, c. 142, N.J.S.A. 2A:15-5.9 to 5.17, to encompass all punitive damage claims). However, in argument *334 before the trial court, plaintiff pointed to the language in Herman, 133 N.J. at 346, 627 A.2d 1081, directing that "those requirements [for a bifurcated trial should] govern all claims, even those that arise outside the [Products Liability Act]." See also Perth Amboy Iron Works v. American Home Assur. Co., 226 N.J. Super. 200, 227 n. 23, 543 A.2d 1020 (App.Div. 1988), aff'd o.b., 118 N.J. 249, 571 A.2d 294 (1990). Although the Legislature set a later specified date for the applicability of the new Punitive Damages Act, the bifurcated trial provisions were largely declarative of the then-existing common law under Herman, but in addition to other prospective changes added a new "clear and convincing evidence" standard. N.J.S.A. 2A:15-5.12.
The judge incorrectly combined the two aspects of the trial. We find, however, that this alone was not reversible error. The bifurcation is for the defendant's benefit and defendant has not raised this issue. Were this the only problem with the punitive damage claim, we would not disturb the verdict. However, plaintiff claims that she had not presented her full proofs concerning punitive damages during the liability and compensative damage phase of the case. She was forced to argue for punitive damages based on only a fraction of the proof she intended to present.
Prior to Herman and the Products Liability Act, liability issues and punitive damage issues were regularly litigated together. See, e.g., Fischer v. Johns-Manville Corp., 103 N.J. 643, 655, 512 A.2d 466 (1986). However, the Court cautioned that a jury considering both claims must receive specific instructions
regarding the elements that define each [claim] and the evidence that may be considered in support of, on the one hand, strict products liability and, on the other, the damages that liability can support by way of punishment of the defendant manufacturer or distributer of the defective product. The jury must not be misled into believing that the distinct elements of either are a requirement or necessarily relevant to the other.
[Id. at 672, 512 A.2d 466].
*335 The instructions are necessary because, in order to support a punitive damages claim, a plaintiff must show a "a great deal ... about a defendant's conduct" that is unnecessary or irrelevant to the warning defect claim. Id. at 654, 512 A.2d 466. Therefore, the trial court must "carefully" explain "the purpose and nature of punitive damages" and provide the jury with relevant factors to consider such as
the seriousness of the hazard to the public; the degree of the defendant's awareness of the hazard and of its excessiveness; the cost of correcting or reducing the risk; the duration of both the improper marketing behavior and its cover-up; the attitude and conduct of the enterprise upon discovery of the misconduct; and the defendant's reasons for failing to act.
[Id. at 672-73, 512 A.2d 466].
In contrast, here, the court's entire charge on punitive damages was as follows:
In addition to the claims of damages already mentioned, you should consider whether plaintiff is entitled to punitive damages which are awarded in exceptional cases as the punishment of the defendant and as a deterrent to others from following his or her example. You may award such damages if you determine that the defendant's acts or omissions were actuated by one[,] actual malice, which is nothing more or less than intentional wrongdoing, an evil minded act, or two, an act accompanied by a wanton and lawful disregard of the rights of another. In other words, a deliberate act or omission with nods [sic] of a high degree of probability of harm to another and reckless indifference to the consequences of his or her or its omission.
Therefore, even if we agree arguendo that defendant's position is correct that plaintiff had sufficiently presented the jury with all available evidence relating to punitive damages, the jury was not given the necessary tools to evaluate the punitive damage evidence.

e.
The matter must be remanded for a new trial on the issues of (1) whether defendant's failure to warn was a proximate cause of plaintiff's injuries, and if the jury so determines, (2) how the compensatory damages should be allocated, and (3), applying the procedures dictated by Herman v. Sunshine Chemical Specialties, Inc. and the appropriate jury instructions, whether punitive damages *336 are to be awarded to plaintiff. The balance of the jury's findings shall stand and be incorporated in the new judgment, if any, against defendant. As we have noted in the companion case of Batson v. Lederle Laboratories, the two cases are to be consolidated for the trial in Batson and the retrial of this case.
Reversed and remanded for a limited new trial.
NOTES
[1] A third case, Robert London v. Lederle Laboratories, was decided by this court in 1992 when we dismissed the claim on statute of limitations grounds. A-4840-90T1 (App.Div.), certif. denied, 130 N.J. 14, 611 A.2d 652 (1992). Robert recently attempted to reopen his claim after the decisions in Savage v. Old Bridge-Sayreville Med. Group, 260 N.J. Super. 417, 616 A.2d 1307 (App.Div. 1992), aff'd, 134 N.J. 241, 633 A.2d 514 (1993). We rejected the application earlier this term. London v. Lederle Laboratories, A-4010-94T1 (App.Div. 1996).
[2] She also received a prescription for a tetracycline manufactured by Lederle when she was sixteen years old. This latter prescription, however, has no bearing on this case because, at sixteen, plaintiff was beyond the age of the drug's adverse effects.
[3] While the jury had no way of knowing what information Squibb and Pfizer conveyed to Dr. Pierce, the doctor testified that the three products were essentially similar. In fact, we note that the Physicians' Desk Reference for 1964 shows warnings for both the Squibb and Pfizer drugs similar to that included in Lederle's 1964 warnings for Achromycin. (Lederle failed to include Declomycin in the 1964 book because it had already gone to press, but a letter was sent directly to physicians). There was no reference to the tooth-staining problem for any of these drugs in the 1963 edition of the Physicians' Desk Reference. Dr. Pierce's answer to the deposition question concerning Lederle's product cannot in fact be differentiated from his knowledge of the Squibb or Pfizer products. There was evidence, therefore, that he knew of their tooth-staining propensities when he wrote the 1964 prescriptions.