787 A.2d 245 (2001)
346 N.J. Super. 180
Brett J. PRINCE, Plaintiff-Appellant,
v.
GARRUTO, GALEX & CANTOR, Esqs., a Partnership; Bryan D. Garruto, Esq.; Richard Galex, Esq.; and Robert G. Daroci, Esq., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2001.
Decided December 27, 2001.
*246 Dennis A. Cipriano, West Orange, argued the cause for appellant, (Brett J. Prince, pro se, on the brief).
John D. North, Woodbridge, argued the cause for respondents, (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. North, of counsel and on the brief; Robert Beckelman, Iselin, on the brief).
Before Judges PRESSLER, WEFING and LESEMANN.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a legal malpractice case. Plaintiff Brett J. Prince appeals from a summary judgment dismissing his complaint against defendants, the law firm of Garruto, Galex, & Cantor, and several of their partners and associates. We reverse and remand.
The gravamen of plaintiff's legal malpractice action is the handling by defendants of his claims based upon the permanent discoloration of his teeth resulting from his ingestion on numerous occasions from 1965, the year of his birth, to 1970 of Declomycin, a tetracycline drug manufactured and distributed by Lederle Laboratories, Inc. In sum, the defendant-lawyers brought suit only against the pediatricians who had prescribed that drug and did not join Lederle, the manufacturer. Plaintiff claims that Lederle's notice to the medical profession of the teeth-staining risk, first required by the United States Food and Drug Administration (FDA) at the end of 1963, was inadequate and that it was not until 1970, after his pediatricians stopped prescribing Declomycin, that an adequate warning was finally imposed by the FDA on the tetracycline manufacturers. He thus asserts that during the period of 1965 to 1970, both Lederle and the pediatricians were jointly at fault and hence that the defendant-lawyers' failure to join Lederle deprived him of a recovery since the trial against the pediatricians resulted in a no-cause judgment. As we understand the basis of the trial court's decision, it was of the view that since the pediatricians knew of the risk of tooth discoloration when they prescribed the Declomycin, any inadequacy in Lederle's warning at the time in question had no causal effect on the plaintiff's injury and therefore Lederle's omission from the medical malpractice lawsuit resulted in no damage to him. We are unable to agree.
Before addressing the underlying malpractice action and the issue of whether the failure to join Lederle therein presents a prima facie case of legal malpractice, we refer briefly to what is by now the well-known tetracycline story, told and retold in a series of judicial decisions in this State. See, e.g., Batson v. Lederle Labs., 152 N.J. 14, 702 A.2d 471 (1997); Savage v. Old Bridge-Sayreville Med. Group, 134 N.J. 241, 633 A.2d 514 (1993); Feldman v. Lederle (III), 132 N.J. 339, 625 A.2d 1066 (1993); Apgar v. Lederle Labs., 123 N.J. 450, 588 A.2d 380 (1991); Feldman v. Lederle (II), 125 N.J. 117, 592 A.2d 1176 (1991); Feldman v. Lederle (I), 97 N.J. 429, 479 A.2d 374 (1984); London v. Lederle Labs., Inc., 290 N.J.Super. 318, 675 *247 A.2d 1133 (App.Div.1996), aff'd as modified sub nom., Batson v. Lederle Labs, 152 N.J. 14, 702 A.2d 471 (1997). See also Wallace v. Upjohn Company, 535 So.2d 1110 (La.Ct.App.1988), writ denied, 539 So.2d 630 (La.1989); In re Tetracycline Cases, 747 F.Supp. 543 (W.D.Mo.1989); Dawson v. Bristol Labs., 658 F.Supp. 1036 (W.D.Ky.1987); In re Tetracycline Cases, 107 F.R.D. 719 (W.D.Mo.1985).
Tetracycline is a broad-spectrum antibiotic long considered safe and effective in the treatment of numerous infectious diseases. Declomycin was a much used form of that drug, particularly in children, since it requires lower dosages than other forms. Reports began to appear by the late 1950s, however, that ingestion of tetracycline by young children and even by fetuses antepartum had caused irreversible staining and discoloration of the permanent teeth and even, in extreme cases, malformation of the teeth. The knowledge of this phenomenon had become sufficiently widespread to induce the FDA, by the end of 1963, to require all tetracycline manufacturers to issue a precaution to physicians, respecting the tooth-staining risk of that medication. The precaution advised as follows:
The use of drugs of the tetracycline class during tooth development (last half of pregnancy, infancy and childhood to the age of 8 years) may cause permanent discoloration of the teeth (Yellow-Gray-Brown). This adverse reaction is more common during long-term use of the drugs but has been observed following repeated short-term courses.
In 1970, however, continued reports, information and documentation resulted in the FDA effectively upgrading the precaution into a warning to which the following language was added:
Tetracycline drugs, therefore, should not be used in this age group unless other drugs are not likely to be effective or are contraindicated.
The total warning, both the original precaution and the added language, are printed in capital letters in the Physicians' Desk Reference (PDR), in which the warning first appeared in 1971.
Much of the proof adduced in the malpractice trial against the pediatricians, Drs. Julian Orleans, Theodore Eisenstein and Morton Rachelson, was undisputed. During the first months of his life, plaintiff was under the care of Dr. Orleans, who had prescribed Declomycin for him for an upper respiratory infection when he was about seven months old. In December 1965, while still taking that prescription, plaintiff came under the care of Drs. Eisenstein and Rachelson, who practiced in partnership, and he was treated by both until 1979. During the first five years of his life, plaintiff was subject to frequent upper respiratory infections, including middle ear infections, and was prescribed Declomycin on fifteen occasions, although other medications were used from time to time. Indeed, Dr. Eisenstein testified that between 1965 and 1970, plaintiff suffered from infectious diseases on forty-seven occasions and was prescribed Declomycin on fifteen of them. On three occasions no antibiotics at all were prescribed, and on the twenty-nine others, antibiotics including sulfa drugs, erythromycin and lincocyn, all of which also posed some side-effect risks, were prescribed. Although treated with penicillin on occasion, plaintiff developed a penicillin allergy in 1968, ruling out further use of that drug.
Both Dr. Eisenstein and Dr. Rachelson testified that although they were aware, to some extent, of the potential tooth-staining risk of Declomycin, they regarded it nevertheless as the broad spectrum antibiotic of choice for infectious diseases, so recognized by the pediatric community, safe and *248 effective, and routinely prescribed for, among other problems, upper respiratory infections, until 1970. In that year both Dr. Eisenstein and Dr. Rachelson stopped the routine prescription of Declomycin and other tetracyclines for upper respiratory infections. Dr. Eisenstein attributed two reasons to that decision. He testified that it had become "more and more apparent in the literature that tetracycline was probably responsible for some teeth staining." He also explained that other drugs were coming on the market that provided alternatives to tetracycline. Dr. Rachelson attributed his much more limited use of tetracycline after 1970 to the same causes, noting that "[t]here were increasing reports and knowledge that I had gained pointing out to this [the tooth-staining risk]...." Consequently, he then stopped prescribing tetracycline "routinely under the age of seven or eight," reserving its use for specific infectious diseases, not including upper respiratory infections, for which tetracycline remained the drug of choice despite the risk. The jury found that the pediatricians' prescribing of Declomycin for upper respiratory diseases between 1965 and 1970 did not constitute malpractice. We affirmed that judgment on direct appeal. Prince v. Eisenstein, et al., A-4587-94T3 (1997).
This lawsuit against the medical malpractice attorneys ensued. We note that there is an unresolved factual dispute as to whether plaintiff had concurred in the attorneys' decision to omit Lederle from the malpractice action. We also note that plaintiff has asserted that the attorneys led him to believe that Lederle had been joined, inducing him to discharge them before trial when he finally learned that despite his insistence, Lederle had been omitted. That assertion has also not yet been tested. We do point out, however, that plaintiff's substituted counsel in the malpractice case did amend the complaint to join Lederle, but Lederle succeeded in having the complaint against it dismissed since by then the statute of limitations had already run.
The precise issue before us is, of course, whether defendants were negligent in not joining Lederle on the theory that under all the circumstances, the original 1963 precaution was inadequate. They contend on this appeal that that precaution was adequate as a matter of law, thus absolving them from any asserted liability for omitting Lederle from the malpractice action. The issue of the adequacy of the 1963 precaution was not, however, addressed by the trial court, and for the reasons we hereafter discuss, we have concluded that on the record before us the adequacy of the original precaution presented a jury question. Also unaddressed is the defense that omitting Lederle was a sound strategic decision constituting reasonable professional judgment and thus immune from malpractice characterization. See, e.g., Ziegelheim v. Apollo, 128 N.J. 250, 261, 607 A.2d 1298 (1992); Charter Oak Ins. v. State Farm Ins., 344 N.J.Super. 408, 415-416, 782 A.2d 452 (App.Div. 2001). The defendant-lawyers argue that in their professional judgment the 1963 precaution was adequate. Beyond that, they argue that in light of the pediatricians' knowledge of a known risk between the date of the precaution and the date of the unequivocal warning, the lawyers' belief that the primary, if not the exclusive, fault was the pediatricians' constituted a reasonable professional judgment justifying the strategy of not risking the dilution of the pediatricians' fault by asserting the inadequacy of the precaution.
But these are not the bases on which summary judgment was granted. As we understand defendants' argument and the trial court's reasoning, it is predicated on *249 the proposition that either the pediatricians or Lederle was at fault but that both could not have been. Consequently, once the choice was made to sue the pediatricians based on their apparent disregard of the information they had between 1965 and 1970, including the 1963 precaution, plaintiff could not at the same time assert that the 1963 precaution was inadequate. An estoppel theory vis-a-vis Lederle is thus urged based upon the claim of negligence against the pediatricians.
We cannot, however, accept this construct of mutually exclusive liability as between the pediatricians and Lederle. The asserted negligence of the pediatricians is that they should have known enough about the possibility of the risk of tooth staining to have stopped routinely prescribing Declomycin by 1965. The asserted inadequacy of the 1963 precaution is that it failed to sufficiently apprise physicians of the extent of the risk and that had it done so, Declomycin would not have been prescribed as routinely as it was until 1970. These are not mutually exclusive theories and indeed present a classic case of joint liability in which each defendant, while not himself entirely at fault, is at fault to some degree. Moreover, there is, in our view, nothing novel about a joinder of the drug manufacturer on a products liability claim and the prescribing physician based on post-1963 prescriptions. Thus in In re Tetracycline Cases, supra, 107 F.R.D. 719, in an action against the drug manufacturers, plaintiff sought class certification of all persons resident in Missouri from 1983 forward who sustained the stained and deformed teeth consequences of tetracycline use as children, claiming that defendants "failed to include any precautionary labeling at all prior to 1963, while the post 1963 labeling is claimed to have been inadequate." Id. at 722, n. 2. Among the reasons for denying class certification was the concern about "the spectre of allocating fault between ... [a drug company] and a plaintiff's prescribing physician" that "looms over these cases ...," the court noting that while complaints had not yet been filed against the prescribing physicians, it could anticipate that there would at least be third-party claims for contribution filed against them by the drug companies. Id. at 734.
Nor do we find anything in the record of the malpractice trial interdicting the prospect of joint liability as between the pediatricians and Lederle. We point out that during the course of the malpractice trial, none of the defendants was asked if he would have stopped routinely prescribing Declomycin before 1970 if he had known earlier what the scope of the risk was or if the 1970 warning that tetracycline should not be routinely prescribed for young children had been issued earlier. Had any of them conceded that under those circumstances, he would still have routinely prescribed Declomycin for upper respiratory infections, we might have reason for pause. But they were not asked, and certainly the fair inference is to the contrary in view of the testimony that they stopped routine Declomycin prescriptions when their information about the risks became more fully developed.
We also, as we have noted, reject defendants' alternative argument that the 1963 precaution was adequate as a matter of law. First, there are the inferences presented by the evidence. It is certainly arguable that the FDA itself did not consider the 1963 precaution adequate or of continuing adequacy in view of its upgrade of that precaution to a warning in 1970 and its inclusion in that warning of an interdiction against prescribing tetracycline to young children "unless other drugs are not likely to be effective or are contraindicated." And certainly, as well, an inference of inadequacy can be drawn from the fact *250 that despite the 1963 precaution, physicians commonly prescribed tetracycline for young children and pregnant women with upper respiratory infections until 1970, when they began fully to appreciate the nature of the risk, arguably unrevealed to them by the 1963 precaution.[1]
We recognize that most of New Jersey's tetracycline cases involve, in the main, pre-1963 ingestion and hence deal primarily with the failure to warn altogether rather than, as would here be pertinent, the inadequacy of the December 1963 precaution. Only in Savage, supra, 134 N.J. at 246, 633 A.2d 514, was the plaintiff's use of tetracycline extended long beyond that time and until 1971. But the Savage action was brought only against the physicians, and the issue the Supreme Court addressed was the statute of limitations. Thus the adequacy of the 1963 precaution was not there in issue. Nevertheless that question has been before other courts. See In re Tetracycline Cases, supra, 107 F.R.D. 719. And see In re Tetracycline Cases, supra, 747 F.Supp. 543, rejecting the drug manufacturers' federal preemption argument raised in defense of the claims of a group of plaintiffs, all of whom had been given tetracycline after the December 1963 precaution, thus permitting their inadequate-warning case to go to trial. As the court there concluded
This evolution of case law which leads to the conclusion in Feldman [97 N.J. 429, 479 A.2d 374 (1984)] is persuasive enough to find that preemption does not bar state common law tort actions of failure to warn adequately. Certainly a jury could find defendants might have taken other actions supplementing and complementing the FDA warning requirements, and such actions need not be inconsistent or conflicting with the federal requirements. For example, writing additional letters to doctors, distributing brochures to consumers, and posting notices at obstetrics and pediatric clinics all perhaps could have been done without violating FDA requirements or frustrating FDA's policy and purpose. Such conditions lack the sort of direct conflict (such as that in Cosmetic, Toiletry, supra, and Grocery Manufacturers [of America, Inc. v. Gerace], supra [755 F.2d 993 (1985)]) needed to find implied preemption. Upon finding that supplemental warning actions were not precluded by preemption, a genuine issue of fact remains concerning what, if anything, defendants should have done to warn adequately. Therefore, summary judgment cannot be granted on the grounds of preemption.

[Id. at 550.]
In opposing the defendant-lawyers' motion for summary judgment, plaintiff relied on a written report submitted by a medical expert for the medical malpractice defendants in the underlying trial that opined that routine use of tetracyclines in young children was almost universal among pediatricians during the period in question and that the 1963 precaution was not then regarded as sufficiently significant to inhibit their use. Quoting the text of the precaution and considering the pharmacological environment then obtaining, the report concludes that
the statement was indistinguishable from any of the innumerable precautionary statements used for the thousands of medications listed in the PDR. There was no statement to suggest, much less *251 recommend, that tetracycline not be used in pediatrics. In fact, multiple specific infant and child tetracycline preparations continued on the market for years past this period in question. These warnings were in marked contrast to specific and emphasized warnings placed on, for example, chloramphenicol, another extremely popular contemporary antibiotic of the time. There is no way any thoughtful, knowledgeable pediatrician up through 1970 would be expected to deprive his ill patients of the enormous potential benefit of tetracycline medication because of this innocuous precautionary note. Indeed, such denial of use of tetracycline was never recommended to this points in time in the PDRs. In conclusion, it was extremely common and an entirely appropriate and acceptable standard of pediatric practice of Drs. Eisenstein and Rachelson to prescribe Declomycin to Brett Prince until 6/19/70. The medical literature clearly confirms that they did not deviate from accepted standards of medical practice in doing so.
We are thus persuaded that the adequacy of the 1963 precaution, in terms of its giving sufficient information to the medical profession, was not a settled question of law. Consequently, we consider the legal malpractice action in the light of our conclusion that in the underlying action a jury could have found that Declomycin was a defective product based on the inadequacy of the 1963 precaution and could also have found the pediatricians negligent in having prescribed it between 1965 and 1970.
The ultimate issue in the legal malpractice action is whether the defendant-lawyers' decision to omit Lederle was a reasonable exercise of professional judgment. Obviously, the question of the inadequacy of the 1963 precaution is relevant to the issue of the lawyers' liability in two respects. First, if the jury in the legal malpractice action should find, by way of a trial within a trial, that the 1963 precaution was adequate, Lederle would consequently not have been liable for a defective product, and no liability could therefore attach to the lawyers for having omitted Lederle from the underlying action. On the other hand, a determination by the jury that the 1963 precaution was inadequate would not, however, conclusively dispose of the issue of the lawyers' liability since, in that event, the jury would still be free to find that the question of the adequacy of the 1963 precaution was sufficiently debatable to justify the lawyers' decision to omit Lederle for the strategic purpose of strengthening plaintiff's case against the pediatricians. Clearly a legal strategy may be perfectly reasonable even if ultimately unsuccessful. See Charter Oak Ins. v. State Farm Ins., supra, 344 N.J.Super. at 415-416, 782 A.2d 452; Spaulding v. Hussain, 229 N.J.Super. 430, 442, 551 A.2d 1022 (App.Div.1988).
In resisting the defendant-lawyers' summary judgment motion, plaintiff also relied on an expert report opining that the lawyers' omission of Lederle from the underlying action had been professionally negligent.[2] That, of course is the question that *252 must now be determined. We are persuaded that in the context of the issues presented in the legal malpractice case and the record as a whole, including the expert reports and the record of the medical malpractice trial, plaintiff demonstrated a sufficient prima facie case of legal malpractice to require denial of the summary judgment motion. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
The summary judgment is reversed and we remand for further proceedings.
NOTES
[1] In Morlino v. Medical Ctr., 152 N.J. 563, 572, 706 A.2d 721 (1998), an action based on the alleged negligence of prescribing Cipro in 1990 to a woman in late pregnancy suffering from pharyngitis, the prescribing doctor explained that he could not have given "tetracycline because of the risk of fetal tooth discoloration."
[2] Plaintiff also relied on the written report of a psychologist characterizing himself as a human factors expert, particularly in the area of consumer safety, who criticized the efficacy of the 1963 precaution. Without at this time ruling on the admissibility of such testimony, we point out that any expert testimony must address not what the average lay consumer would have understood from the warning, but rather what a qualified and practicing physician would have understood. We adhere to the learned intermediary concept. See, e.g., Niemiera by Niemiera v. Schneider, 114 N.J. 550, 559, 555 A.2d 1112 (1989). The prescription drug manufacturer's warnings are addressed to physicians, and the question is whether the warning is adequate to apprise the physician of the medication's risk in order to permit the physician to make an informed risk-benefit analysis before prescribing it. The question in this regard is whether an expert of such credentials and experience as this proffered human factors expert is qualified to render an opinion on how physicians would or should react to a labeling precaution.