**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4307-14T1

DEBORAH DIGIOVANNI and
RICHARD DIGIOVANNI,

    Plaintiffs-Appellants,

v.

SAKER SHOP RITES, INC. and
ANTHONY INTERNATIONAL,

    Defendants,

and

WAKEFERN FOOD CORPORATION;
LEER, INC.; LEER LIMITED PARTNERSHIP;
DEXTER APACHE HOLDINGS, INC.;
A & J REFRIGERATION, INC.; and
ARCTIC GLACIER, INC.,

    Defendants-Respondents.

_____

Submitted November 1, 2016 — Decided June 14, 2017

Before Judges Fisher, Leone, and Vernoia.

On appeal from Superior Court of New Jersey,
Law Division, Monmouth County, Docket No. L-
4465-11.

Shebell & Shebell, LLC, attorneys for
appellants (Thomas F. Shebell, III, of
counsel; Robert A. Morley, on the briefs).

Wolff, Helies, Spaeth & Lucas, attorneys for respondent Wakefern Food Corporation (Bruce E. Helies, on the brief).

Rawle & Henderson LLP, attorneys for respondents Leer, Inc.; Leer Limited Partnership; and Dexter Apache Holdings, Inc. (Valerie Kellner, on the brief).

Law Offices of Styliades & Jackson, attorneys for respondent A&J Refrigeration, Inc. (Denise F. Tunney, of counsel and on the brief).

Daly, Lamastra, Cunningham, Kirmser & Skinner, attorneys for respondent Arctic Glacier, Inc. I/P/A Arctic Glacier (Olivier J. Kirmser, on the brief).

PER CURIAM

In this slip and fall lawsuit, the trial court dismissed the complaint on summary judgment. Plaintiffs appeal. We affirm.

I.

Plaintiff Deborah DiGiovanni was a cashier at the ShopRite supermarket in Hazlet.[1] Plaintiff claims that she slipped and fell on a puddle of water near a freestanding ice machine at the entrance to the store. She sued the owner of the store, defendant Saker ShopRites, Inc., but summary judgment was granted because Saker ShopRites was her employer and thus was immune from suit under the Workers' Compensation Act. See N.J.S.A. 34:15-8. She

---

[1] Although the complaint was filed by Deborah and her husband Richard DiGiovanni, his claim of loss of consortium is derivative of her claims. Thus, we will refer to Deborah as "plaintiff."

does not appeal that ruling, so the liability of the owner of the store is not before us.

Instead, plaintiff appeals the trial court's orders granting summary judgment to defendants Wakefern Food Corporation (Wakefern), a cooperative that supplied the ice machine to the store; Arctic Glacier, Inc. (Artic Glacier), which had a contract to service and repair Wakefern's ice merchandising equipment; A&J Refrigeration, Inc. (A&J), which serviced the ShopRite's refrigeration systems; and Leer, Inc., Leer Limited Partnership, and Dexter Apache Holdings, Inc. (collectively Leer), which manufactured the ice machine.[2]

Plaintiff claims the ice machine was not properly serviced, causing the water to leak from the ice machine. We summarize the pertinent deposition testimony.

Plaintiff testified as follows. On October 8, 2009, she was leaving the store on break. She slipped and fell on "[t]he water that was leaking from the ice machine." She knew the water was from the ice machine because "[i]t was underneath the machine" and "there's nowhere else for water to come [from]." The water was "[r]ight in front of it . . . by the door." She did not see the

---

[2] The court also granted summary judgment to Anthony International, which manufactured the ice machine doors. Plaintiff did not appeal that ruling.

water before she fell on her back, but her "whole back was wet." The ShopRite was always having trouble with the ice machine, and she often saw store employees pulling bags of ice out of it.

The ShopRite's night manager in October 2009, Robert J. Scott, testified that on occasion "there would be some water that would once in a while leak to the floor in and around the ice case." He "noticed water coming from the machine probably between five and ten times" in the three or four months surrounding the incident, including "one or two times" in October. "[T]he case would leak from the bottom underneath the doors and then it would pool around the case itself."

Scott clarified that "[w]hen I say I've seen water in that area several times, it doesn't necessarily mean that it always came from the case." When customers removed bags of ice from the machine, the bags sometimes broke open and spilled loose ice on the floor. Customers who were buying multiple bags, and employees who were loading bags into the machine, sometimes set bags on the floor, causing condensation to accumulate. He did not know whether the water was coming from the ice machine on the day of the incident.

Brian Hagman, ShopRite's maintenance chief, testified he cleaned liquid off the floor within ten feet of the ice machine six or seven times since the incident, but he never saw liquid

coming directly from the machine, and he was unaware of any leakage from the machine prior to the incident.

Philip Proteau, a refrigeration mechanic employed by Arctic Glacier, testified he serviced the ice machine on October 9, 2009, the day after the incident. He cleaned a clogged condenser and replaced a slow-turning condenser fan motor. Dust and dirt could accumulate on the condenser coils, block the air flow, and cause the fan motor to burn out and turn more slowly, which could result in the condenser overheating and shutting off and the ice beginning to melt. However, the Leer ice machine was "a self-sealed unit" that had a twelve-inch well below the doors to hold any melted water, and that "doesn't allow any water to escape unless the floor plug is not in the bottom of the box" or is installed incorrectly. When he serviced the machine, he did not note any problem with the floor plug, the door hinges, or the door gaskets, or any evidence of leaking.

Plaintiff retained an expert, George H. Meinschein, who drafted a January 9, 2013 report. On October 21, 2013, the trial court barred the report as net opinion. On June 23, 2014, the court granted summary judgment in favor of Wakefern, A&J, and Arctic Glacier. Plaintiff sought reconsideration of both orders, which the court denied on December 19 and 22, 2014. On July 13, 2015, the court denied plaintiff's motion to vacate those orders.

Meanwhile, on April 22, 2015, another judge entered a judgment in favor of Leer, confirming a February 26, 2015 no-cause arbitration award. Plaintiff appeals all those orders.

## II.

We first address the trial court's exclusion of Meinschein's expert report. "When, as in this case, a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (citation omitted). "Appellate review of the trial court's decisions proceeds in the same sequence, with the evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court. As a discovery determination, a trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review." Id. at 52 (citation omitted). Accordingly, we review a trial court's decision whether to admit expert testimony under an abuse of discretion standard. Id. at 53. We must hew to that standard of review.

"The net opinion rule is a 'corollary of'" N.J.R.E. 703, "'which forbids the admission into evidence of an expert's

6

conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (citation omitted). Thus, "an expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011).

Moreover, the net opinion "rule requires that an expert '"give the why and wherefore" that supports the opinion, "rather than a mere conclusion."'" Townsend, supra, 221 N.J. at 54 (citation omitted). The rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (citation omitted). Under the rule, "a trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record." Ibid.

Meinschein's January 9, 2013 four-page report listed the materials he reviewed and gave a brief description of the accident. The report then described Meinschein's physical examination of the ice machine on February 9, 2012, which found no defect in the machine. In the brief "Discussion & Analysis" section that followed, the report summarized the deposition testimony of three

individuals.  On the key issue of whether water leaked from the ice machine, he cited the deposition testimony of

> Robert J. Scott, the night manager of the Hazlet Shop Rite at the time of Ms. DiGiovanni's incident, [who] testified that he had seen water leak from the subject ice merchandiser on several occasions and that "the case would leak from the bottom underneath the doors and then it would pool around the case itself."[3]

Meinschein's report then concluded:

1. The history of repeated water leakage from the subject ice merchandiser indicates that Wakefern Food Corporation failed to have the unit properly serviced.

2. Wakefern Food Corporation's lack of maintenance and service records for the subject ice merchandiser is representative of substandard equipment maintenance practices.

3. Wakefern Food Corporation's lack of maintenance and service records for the subject ice merchandiser contributed to the unit's degraded condition and propensity to leak water onto the floor in front of the unit.

4. Inadequate and substandard equipment service procedures by Wakefern Food Corporation were causative factors in the October 8, 2009 water accumulation on the floor in front of the subject ice merchandiser.

---

[3] Meinschein also referenced testimony by Hagman and John Mendola, Wakefern's merchandizing supervisor, but Meinschein cited only their testimony about who serviced the ice machine, not about whether or why the ice machine might have leaked.

5. Inadequate and substandard service procedures by Wakefern Food Corporation were causative factors in Ms. DiGiovanni's October 8, 2009 slip, fall, and subsequent injuries.

Meinschein did not allege any design or manufacturing defects or negligence by anyone other than Wakefern.

The trial court properly found Meinschein's report was a net opinion. The only fact the report mentioned supporting that water leaked from the ice machine was plaintiff's version of the incident and Scott's testimony about other occasions. The report then leapt to conclusions about improper servicing without explaining why improper servicing caused the machine to leak.

Meinschein's deposition testimony added no support for those conclusions. He testified his physical inspection found nothing wrong with the doors or the gaskets sealing the door. He saw no leak when he inspected the machine, and the doors were shut tight. He noticed no rust on the machine and did not tilt the machine to look underneath to examine the drain plug or the floor underneath the ice machine. Based on his inspection, he found "no evidence that it had been leaking" or "had ever leaked."

Meinschein testified nothing indicated the water on the floor at the time of the incident leaked from the ice machine other than "the testimony of the night manager that said the machine had

leaked from time to time." However, Meinschein agreed with Scott that the handling of ice bags by customers and store employees could result in water in front of the machine, including at the time of the incident.

Meinschein testified there were only "two possibilities" of how water could have come from the ice machine:

> Number one is excessive frost buildup prevents the doors from sealing properly. So then we can have leakage at the edge of the door. Or number two, the machine wasn't working properly and things were starting to melt and we have water leaking out of the bottom of the well that the plug wasn't put in properly.

However, Scott testified that he had not seen any water leaking from the doors, and that the doors had nothing to do with the leaking. Moreover, Meinschein conceded there was no record that the plug was installed improperly. Thus, Meinschein had no factual support that either of these theoretical sources of leakage had occurred. Meinschein ultimately admitted he did not know if the machine leaked or why it leaked.

Therefore, Meinschein offered only a "bare opinion" with "no support in factual evidence or similar data" and no explanation why the ice machine leaked on this occasion. Thus, we affirm the trial court's October 21, 2013 order excluding Meinschein's report and testimony as a net opinion.

A-4307-14T1

After Proteau's May 20, 2014 deposition, Meinschein prepared a May 29, 2014 supplemental memorandum. Meinschein stated Proteau "found that the condenser fins were clogged and that the condenser fan motor had failed." Meinschein added that when he examined the ice machine on February 9, 2012, he "observed that the condenser fins were loaded with dust/debris and partially clogged." He stated:

> Clogged condenser fins diminish the dissipation of heat from the refrigeration system, which ultimately results in the inability of the ice merchandiser to maintain the interior of its cabinet below the freezing point of water. The ice inside and any frost buildup on the walls and doors begins to melt, thereby presenting water droplets that puddle under the doors at the front of the machine.

He concluded "the October 9, 2009 service provided by Mr. Proteau is fully consistent with an ice merchandiser that would have leaked water onto the floor in front of the machine on October 8, 2009."

However, Meinschein never explained how water would have leaked from the self-sealed, water-tight case. Thus, he failed to establish "a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981).[4]

---

[4] Because plaintiff's claim fails even when we consider both Meinschein's original and supplemental reports, we need not address plaintiff's claim that Wakefern's motion to exclude the original report was premature.

A-4307-14T1

Plaintiff moved for reconsideration of the order excluding Meinschein's net opinion, attaching his supplemental report and Proteau's testimony. Although the motion to reconsider that non-final ruling was not untimely, the decision whether to grant reconsideration is left to the "sound discretion" of the trial court. Lombardi v. Masso, 207 N.J. 517, 534 (2011) (quoting R. 4:42-2). "[A] trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (citing Hous. Auth. v. Little, 135 N.J. 274, 283 (1994)). We find no clear abuse of discretion in the trial court's ruling on the merits of the motion. Thus, we affirm the court's December 19 and 22, 2014 denial of reconsideration of its order excluding Meinschein's net opinion, and its July 13, 2015 refusal to vacate that order.

## III.

We next address the trial court's orders granting summary judgment to Wakefern, Arctic Glacier, and A&J. Summary judgment must be granted if the court determines "that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to

the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). "[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).

A.

In granting summary judgment to Wakefern, the trial court stressed Meinschein's report "was barred by the Court as a net opinion," so "plaintiff has no support [for] his claim by way of expert opinion to satisfy the burden of proof."[5] The court reached that conclusion even considering "the findings of [Proteau] with regard to the fan having residue and . . . not being maintained in the manner it should have been maintained."

_____

[5] Plaintiff complains the trial court also mentioned Wakefern's expert report. Of course, "[i]n considering a request for summary judgment, the trial court, as is well-settled, 'must accept as true the evidence supporting [the non-moving party].'" Ames v. Gopal, 404 N.J. Super. 82, 85 (App. Div. 2008) (quoting Gen. Elec. Capital Auto Lease v. Violante, 180 N.J. 24, 28 (2004)), certif. denied, 198 N.J. 316 (2009). However, the trial court relied not on Wakefern's report but on the absence of any expert testimony supporting plaintiff's claim. Cf. Strumph v. Schering Corp., 256 N.J. Super. 309 (App. Div. 1992), rev'd, 133 N.J. 33 (1993) (reversing substantially for the reasons stated in the dissent).

Having excluded Meinschein's expert opinion, the trial court did not err in granting summary judgment. "[A] negligence cause of action requires the establishment of four elements: (1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Util. Co., 212 N.J. 576, 594 (2013). "The plaintiff bears the burden of establishing those elements, 'by some competent proof.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (citations omitted). "Claims involving workplace accidents commonly fall into the category in which the plaintiff must produce reliable expert testimony to establish the standard of care and to explain how the defendant's actions departed from that standard." Fernandes v. DAR Dev. Corp., 222 N.J. 390, 405 (2015).

Moreover, "[w]hen the proofs involve a defect in a complex instrumentality, an expert is frequently required to assist the jury in understanding the mechanical intricacies and weighing competing theories of causation." Ford Motor Credit Co., LLC v. Mendola, 427 N.J. Super. 226, 236-38 (App. Div. 2012) (finding expert testimony is required to explain the proper maintenance of an automobile). The ice machine was a complex instrumentality. See Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J. Super. 320, 331-32 (App. Div. 2004) (finding "the locking mechanism of [a] gurney is sufficiently complex to require expert testimony").

The proper maintenance of the ice machine "'constitutes a complex process involving assessment of a myriad of factors' that 'is beyond the ken of the average juror.'" See Davis, supra, 219 N.J. at 408 (citation omitted). What duty of care governs maintenance of an ice machine, how that duty was breached, and whether improper maintenance would cause the ice machine to leak "falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge [so] expert testimony [is] required." See Jerista v. Murray, 185 N.J. 175, 199 (2005). Thus, without expert testimony, plaintiff could not show a duty of care, a breach of that duty, or causation.

Plaintiff, who offered expert testimony, now contends expert testimony was not required. We recognize that "[w]hen the average juror can deduce what happened without resort to scientific or technical knowledge, expert testimony is not mandated" even for complex instrumentalities. Id. at 200. Thus, in Jerista, where a supermarket conceded its automatic door closed on and injured a customer, the jury could infer, "based on common knowledge without resort to expert testimony," that an automatic door "probably does not close on an innocent patron causing injury unless the premises' owner negligently maintained it." Id. at 197.

Here, by contrast, defendants disputed both that the ice machine had leaked and that negligent maintenance of the condenser

and fan would have caused the machine to leak. Further, it was conceded even by plaintiff's expert that water could have gotten on the floor by other causes, namely in the handling of ice bags by customers and store employees. Under those circumstances, "only with the assistance of expert testimony could the jurors decide the question." Id. at 200.

Plaintiff next offers several theories why Wakefern could be liable without expert testimony. She argues Wakefern owed a non-delegable duty to persons who walked past the ice machine. She cites cases involving owners, landlords, and licensees of real property. "An owner of a building has a non-delegable duty to exercise reasonable care for the safety of tenants and persons using the premises at his invitation. That the owner contracts for maintenance of [equipment on its premises] does not relieve it of that duty[.]" Rosenberg v. Otis Elevator Co., 366 N.J. Super. 292, 303 (App. Div. 2004) (citation omitted). However, "[t]hat rationale does not apply in the present case," because Wakefern does not own the ShopRite building. Kuzmicz v. Ivy Hill Park Apartments, Inc., 147 N.J. 510, 517 (1997). Rather, the building was owned by Saker ShopRites, which, under the Workers' Compensation Act, is immune from suit by plaintiff. Wakefern merely provided ShopRite stores with Leer ice machines in exchange for them selling its private ice brand.

16

Moreover, the ShopRite's entrance passageway adjacent to the ice machine was not "within the exclusive control of" Wakefern. Kramer v. R. M. Hollingshead Corp., 5 N.J. 386, 390 (1950) (distinguishing Cicero v. Nelson Transp. Co., 129 N.J.L. 493 (1943)). Nor was Wakefern a general contractor in "physical control" of the premises. See Wellenheider v. Rader, 49 N.J. 1, 12 (1967) (distinguishing Schwartz v. Zulka, 70 N.J. Super. 256 (App. Div. 1961), modified on other grounds sub nom. Schwartz v. N. Jersey Bldg. Contractors Corp., 38 N.J. 9 (1962)). Wakefern was not a "possessor of land" of the ShopRite's entrance passageway, as there was no evidence Wakefern occupied or controlled or intended to control that passageway. Parks v. Rogers, 178 N.J. 491, 497 n.2 (2003) (quoting Restatement (Second) of Torts § 328E(a) (1965)); see Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 49(a) (2012).[6]

---

[6] In her appellate reply brief, plaintiff argues for the first time Wakefern was "[o]ne who does an act or carries on an activity upon land on behalf of the possessor," Restatement (Second) of Torts § 383 (1965), and thus owed a "duty to warn" plaintiff, La Russa v. Four Points at Sheraton Hotel, 360 N.J. Super. 156, 163 (App. Div. 2003) (imposing a duty to warn where a delivery person tracked snow into a hotel, creating a puddle). "'To raise [this] issue initially in a reply brief is improper.'" State v. Lenihan, 219 N.J. 251, 265 (2014) (citation omitted). "We generally decline to consider arguments raised for the first time in a reply brief." Bacon v. N.J. State Dep't of Educ., 443 N.J. Super. 24, 38 (App. Div. 2015), certif. denied, 224 N.J. 281 (2016).

Plaintiff next cites a "mode of operations" case, <u>Wollerman v. Grand Union Stores, Inc.</u>, 47 <u>N.J.</u> 426, 429 (1966), one of "a series of decisions arising from personal injuries sustained by business invitees on the premises of businesses whose operations involve customer self-service." <u>Prioleau v. Ky. Fried Chicken, Inc.</u>, 223 <u>N.J.</u> 245, 248 (2015). "Under the mode-of-operation rule, a business invitee who is injured is entitled to an inference of negligence and is relieved of the obligation to prove that the business owner had actual or constructive notice of the dangerous condition that caused the accident." <u>Ibid.</u> However, Saker ShopRite was the business owner on whose premises plaintiff slipped. Wakefern did not own the premises, have employees on the premises, invite customers to the premises, or make sales to those customers. <u>Cf.</u> <u>Wollerman</u>, <u>supra</u>, 47 <u>N.J.</u> at 429. Accordingly, plaintiff cannot show duty, breach of duty or causation without expert testimony. <u>See</u> <u>Townsend</u>, <u>supra</u>, 221 <u>N.J.</u> at 60.

B.

Summary judgment was similarly appropriate as to Arctic Glacier. Without expert testimony establishing a duty to plaintiff, breach of duty, and causation, plaintiff could not establish negligence by Arctic Glacier. Not only was Meinschein's expert report an inadmissible net opinion, but Meinschein did not

even purport to offer an opinion of negligence by anyone other than Wakefern.

In addition, the trial court granted summary judgment because the evidence indicated Arctic Glacier was only "responsible for repairs on an on-call basis," as there was "no causal connection." Plaintiff argues the trial court misunderstood Arctic Glacier's role. We need not address plaintiff's argument, as the absence of expert testimony justified summary judgment on causation.

C.

For the same reason, summary judgment was also appropriate in favor of A&J. The exclusion of Meinschein's expert testimony, and the absence of any expert testimony indicating A&J had a duty, breached a duty, and caused plaintiff's incident, was itself sufficient grounds for summary judgment.

In addition, the trial court ruled A&J "did not service[,] maintain or repair the ice unit in question" and "had no ongoing responsibility" to do so. Plaintiff argues this contravenes Scott's testimony. Again, given the lack of expert testimony to show A&J was negligent, we need not resolve plaintiff's argument.

Plaintiff also argues A&J failed to provide full discovery, specifically the documents A&J's Sigmund Gremboeic reviewed before testifying A&J did not service the ice machine. "A motion for summary judgment is not premature merely because discovery has not

been completed, unless plaintiff is able to '"demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action."'" Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (citation omitted). Absent expert testimony, plaintiff cannot show discovery of the documents would "alter the outcome." Young v. Hobart W. Grp., 385 N.J. Super. 448, 469 (App. Div. 2005).

Accordingly, we affirm the trial court's June 23, 2014 grant of summary judgment to Wakefern, Arctic Glacier, and A&J, its denial of reconsideration on December 19 and 22, 2014, and its July 13, 2015 refusal to vacate summary judgment.

IV.

Finally, plaintiff argues, "in the event the [c]ourt reverses summary judgment granted to Wakefern, Arctic Glacier and A&J, it should likewise reverse [the April 22, 2015] judgment granted pursuant to R. 4:21A-6 to Leer" confirming the arbitration award that Leer was not at fault. Plaintiff's argument fails because we affirm those grants of summary judgment.

In any event, plaintiff did not seek a trial de novo to challenge the arbitration award or oppose Leer's motion to confirm the award. See R. 4:21A-6. "Once the award is confirmed and a judgment is entered, an appeal from the award or any interlocutory order is barred." Grey v. Trump Castle Assocs., L.P., 367 N.J.

<u>Super.</u> 443, 449 (App. Div. 2004).  Reversal of summary judgment against other defendants would not revive plaintiff's action against Leer.  <u>Cf.</u> <u>Mettinger v. Globe Slicing Mach. Co.</u>, 153 <u>N.J.</u> 371, 389 (1998) (addressing contribution between defendants).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4307-14T1